MONTGOMERY COUNTY et al. v. HUMBLE OIL & REFINING CO.

No. 4786.

Court of Civil Appeals of Texas. Beaumont.

Dec. 31, 1951.

Rehearing Denied Jan. 17, 1952.

Looney, Clark & Moorhead, Everett L. Looney, and R. Dean Moorhead, all of Austin, Geo. B. Darden, A. K. Stewart, and Arnold Smith, Conroe, for appellants.

Knox W. Gilmore, Houston, W. C. McClain, Conroe, for appellee.

R. L. MURRAY, Justice.

This is an appeal by appellants Montgomery County, Texas, its Tax Assessor-Collector, members of its Commissioners' Court and its County Attorney, from an order of the Special Ninth District Court of Montgomery County, by which order said District Court upon the suit of appellee Humble Oil & Refining Company, enjoined them by a temporary writ of injunction from collecting or attempting to collect any taxes for the year 1950 from appellee, except upon the valuations as rendered by appellee. The order was entered and temporary injunction granted after an extended hearing before the court.

Humble Oil & Refining Company's first amended original petition, upon which the hearing was had, after the formal allegations, alleged and prayed as follows:

"III.

"That for the year 1950, and within the time required by law, and on or about the 19th day of April, 1950, plaintiff filed with the Tax Assessor-Collector of Montgomery County, Texas, its rendition and inventories of its properties within said county, the description and rendered value of which, in so far as the properties herein involved are concerned, and reflected by a true copy of said rendition attached hereto and made a part hereof and marked Exhibit 'A'. Said rendition of the properties here involved, as aforesaid, constituted an assessed value of $16,044,710.00, which rendition was accept-

ed by the Assessor-Collector of Montgomery County, Texas, without change, and as a proper rendition of plaintiff's properties.

"IV.

"On this plaintiff's original rendition, which was accepted by the Assessor-Collector of Montgomery County, was included and inventoried various properties other than oil and gas producing properties and upon which plaintiff has paid taxes on a total value of $668,080.00, amounting in taxes to the sum of $11,998.55, which taxes were accepted by the Tax Assessor-Collector, and his receipt issued therefor to the plaintiff on the 26th day of January, 1951, and said properties are not involved in this litigation and are not oil and gas producing properties.

"V.

"Some time prior to the time when plaintiff made and filed its rendition of its properties in said county, the Commissioners' Court of Montgomery County employed the firm of Pritchard and Abbott to make appraisals of oil properties on the county tax rolls. On or about September 5, 1950, said Commissioners' Court, as constituted for the year 1950, met as a Board of Equalization for the announced purpose of equalizing assessments of oil and gas properties on the Montgomery County tax rolls. Said Board, notwithstanding the plain, unambiguous requirements of the statutes governing the Boards of Equalization, directed the Assessor-Collector to produce only those portions of the tax rolls and tax renditions containing assessments of oil and gas properties and summoned only the owners of such properties to appear before said Board of Equalization. On the date last above mentioned, to-wit, September 5, 1950, or a few days prior thereto, said Board of Equalization advised John L. Abbott, of the firm of Pritchard and Abbott, that the County required an amount on the oil and gas interests equal to the total for said valuations on said oil and gas interests for the year 1949, in order that said County might obtain a total tax roll of $70,000,000.00. At the same time, the Board of Equalization advised said John L. Abbott that it would be agreeable with said Board, if accepted by the oil and gas interests on the day set for the hearing, that the County would be willing to deduct from the oil and gas interests and the other valuations of the County on other rolls exceeded the sum of $70,000,000.00. Whereupon, said defendant's appraisers advised the Board of Equalization that such figure would require the tentative values presented on their 1949 schedule to be raised by 5% and proceeded to rework said schedule to provide a raise of 5% from their tentative values which would produce the Board of Equalization's desired total and allow an adequate amount for individual adjustments and still produce a total value of all the rolls in Montgomery County of $70,000,000.00. On or about the same time, John L. Abbott, of the firm of Pritchard and Abbott, advised said Board of Equalization that said increased schedule would result in placing an assessed value on the oil and gas interests of from 30 to 35% of its reasonable cash market value or intrinsic value, and in his opinion would be one-third or $33\frac{1}{3}$% of the total fair cash market value of all the oil and gas interests in Montgomery County, Texas. That on said 5th day of September, 1950, in order to obtain said $70,000,000.00 total assessment for the County, the Board proceeded to raise the rendered value of said oil properties, including this plaintiff's properties, to a value necessary to obtain said $70,000,000.00 total valuation for the County for the year 1950. Such action of the Board resulted in placing the assessed valuation of this plaintiff's properties involved herein on the tax rolls at not less than $33\frac{1}{3}$% of its market value, as shown by the undisputed and uncontradicted testimony before the Board on the day of the hearing before the Board of Equalization, which was the only day this plaintiff was notified to appear before said Board and show cause why its rendered values should not be raised. That the Board of Equalization arbitrarily and unlawfully following out its announced scheme of obtaining a total of $70,000,000.00 on the tax rolls of Montgomery County, and maintaining the local assessments on the rolls at from 10 to 15% of their fair market value, arbitrarily, unlawfully and in direct violation of the constitution and laws

of the state of Texas governing the actions of Boards of Equalization, proceeded to raise this plaintiff's properties involved herein from a rendered value of $16,044,710.00 to $22,509,870.00 or an arbitrary increase of $6,465,160.00, although said rendered values aggregating $16,044,710.00 represented, according to the undisputed testimony before the Board, an assessment at between 20 and 25% of the fair market value of such properties, while the Board of Equalization well knew that all local properties were on the tax rolls at an assessed value of 10 to 15% of its fair market value.

"VI.

"Notwithstanding that Article 7206 of the Revised Civil Statutes of Texas provides 'Each Commissioners' Court shall convene and sit as a Board of Equalization on the Second Monday in May of each year, or as soon thereafter as practicable before the first day of June, to receive all the assessment lists or books of the Assessors of their counties for inspection, correction or equalization and approval,' and said article further provides that 'they shall cause the Assessor to bring before them at such meeting all said assessment lists, books, etc., for inspection, and see that every person has rendered his property at a fair market value * * *,' and notwithstanding the further fact that at said hearing on September 5, 1950, at least one of the members of the Board of Equalization stated in open hearing that the local rolls were out of line as to percentage of value and should be reviewed by the Board and suggested a review by the Board, after the uncontradicted testimony and statements made at the hearing charging that the local properties were on the rolls at not more than 10 to 15% of their fair market values, nevertheless said Board consistently continued to refuse to follow the mandates of the statutes to review said rolls and thus made no efforts to equalize said rolls and obtain equality and uniformity of taxation, although this plaintiff charges that each member of said Board knew and had knowledge of the inequality of percentage of assessments existing between the oil and gas interests and the local rolls and of the gross discrimination against the owners of mineral interests.

"This defendant further alleges that after said uncontradicted and unimpeached testimony presented before said Board at the hearing on September 5, 1950, the Board, in furtherance of its scheme to carry out its desire to obtain the total of $70,000,000.00 tax values in said county by increasing only the oil and gas interests and maintaining the local assessments in a favorable position, and as a subterfuge to try to legalize their unauthorized, arbitrary and unlawful acts, and still refusing to review the tax rolls themselves, now state that they authorized and directed the Tax Assessor-Collector to review such rolls and make recommendations where none had previously *bee* made, and in furtherance of said scheme to try to legalize their unauthorized procedure, approved a list of approximately 84 tax payers whose renditions were less than 10% and whose rendered values were raised to an assessed value of approximately 10% of their reasonable cash market value, in a feeble attempt to show some consideration of and compliance with the unambiguous mandates of the statutes requiring them to review all the rolls and lists of the Tax Assessor.

"VII.

"Plaintiff further alleges that on or about September 5, 1950, when said Commissioners' Court, sitting as a Board of Equalization, was having its purported hearings on equalization of oil and gas properties, plaintiff was represented by its duly authorized agent who protested orally against the above described illegal *section* on the part of the Board of Equalization and the arbitrary and unlawful increase on one class of property while the assessments on all other classes of property were · undisturbed and not reviewed by said Board. In addition to its oral protests, plaintiff whereafter, on the 7th day of September, 1950, filed a formal protest in writing against such action of the Board and such illegal and unlawful and discriminatory raise of its property values, a copy of which written protest is attached hereto, marked Exhibit 'B' and made a part here-

of. Said written protest was by the County Clerk delivered to the Board of Equalization within a few days after the filing thereof, and notwithstanding said Board was in session up until at least the 30th day of September, 1950, it took no action on such protest and completely ignored the same to the extent of not even reading it, and so testified on oral deposition.

"VIII.

"Said increased valuations placed upon the properties rendered for taxation by this plaintiff for the year 1950 are excessive and discriminatory and said increased valuations and the method and scheme employed by said Board of Equalization denied to this plaintiff its rights guaranteed to it under the Constitution of Texas and the Constitution of the United States and the laws of the State of Texas, to have its valuations and assessments determined upon the basis of equality and uniformity with other tax payers in said county.

"IX.

"Notwithstanding the plain and unambiguous provisions of the statutes governing the actions and procedure of the Boards of Equalization of this State, and increased values placed upon the properties of this plaintiff rendered for taxation for the year 1950 have been determined and fixed in an arbitrary and unlawful manner and in contravention of all the evidence adduced during the hearing before said Board of Equalization and in furtherance of the Board's scheme to obtain a total valuation for said County of $70,000,000.00 by an increase on the oil and gas interests without disturbing the local rolls.

"X.

"All of the evidence and information submitted to the Board shows conclusively that the values fixed by the Board on plaintiff's properties constituted approximately 35% of the fair market value thereof, whereas, the property of all tax payers other than the owners of mineral interests was rendered and assessed at not more than 10 to 15% of its fair market value, which fact was well known to the members of the Board. The undisputed testimony and information obtained by said Board shows conclusively that the rendered valuations and assessments of plaintiff's property should have been reduced, instead of increased, in order to equalize the assessment with other property in said county.

"XII.

"The total rendered values of the properties shown on Exhibit 'A', hereto attached and made a part hereof, amount to the sum of $16,044,710.00, which this plaintiff alleges is the true and correct assessment and the only legal assessment which can be made by said Commissioners' Court of said properties. Applying the approved tax rates established for the State by the State authorities and for Montgomery County by the Commissioners' Court, for the year 1950, produces the sum of $287,200.31 which this plaintiff alleges is all the additional taxes that it owes said Montgomery County and the State of Texas for the year 1950, and which it here and now tenders into the Registry of this Court as payment of all taxes due by this plaintiff for said year 1950.

"XIII.

"The Commissioners' Court of said Montgomery County, purporting to act as a Board of Equalization, arbitrarily and illegally failed and refused to follow the mandates of Article 8, Section 1, of the Constitution of Texas, Vernon's Ann.St., and of the Statutes of the State of Texas, which require equality and uniformity of taxation, and said action by the Board of Equalization has effected an unjust and unlawful discrimination against this plaintiff and an unjust and unlawful tax burden and an unlawful taking of this plaintiff's property without due process of law; that if such assessments, unlawfully and illegally placed upon this plaintiff's properties, are permitted to stand, then plaintiff will be deprived of its property without due process of law and denied the equal protection of the law; said assessments so made by said Board of Equalization are void and should be cancelled and set aside, and the only assessment of plain-

tiff's property should be its rendered values shown on its rendition, made as heretofore alleged.

"XIV.

"While the assessments which said Court attempted to place on plaintiff's properties are void, nevertheless they constitute an apparent lien on said properties and a cloud upon plaintiff's title thereto, which should be removed, and unless plaintiff pays upon such unlawful assessment, penalties will attach, under the law, and plaintiff will be further injured by the assessment of interest and penalties on the unlawful tax arrived at by the taxing authorities; the tax rolls showing the excessive assessed value should be corrected to show the proper value, as contained in plaintiff's rendition, which is the true and proper value for assessment of said properties; although this plaintiff has diligently pursued its rights and has made every effort to secure equal and uniform taxation through its appearance, before the Board of Equalization, and through its protest of the incorrect and unfair values placed upon its properties, its efforts to secure equalization and uniformity have been fruitless, and it has no adequate remedy at law and its only remedy is to invoke the equitable jurisdiction of this court and to obtain injunctive relief.

"Plaintiff alleges that it is entitled to a mandatory injunction ordering the Tax Collector to correct said rolls to show the proper assessed values of said properties, and is entitled to a prohibitory injunction restraining the taxing authorities from attempting to fix or establish any character of tax lien upon this plaintiff's properties, and from attempting to collect the unlawful taxes assessed by said county taxing officials. In order that this plaintiff's rights and its property may be protected, it is entitled to a writ of temporary injunction pending the final hearing of this petition for permanent injunction, permanently enjoining said taxing authorities from proceeding further to collect the unlawful and illegal tax imposed upon its properties in said county.

"Wherefore, plaintiff prays that the Court set this cause down for hearing upon this, the plaintiff's application for a temporary injunction, at a time to be fixed by the Court; that due notice issue to the defendants and each of them, and that upon such hearing the Court issue a temporary injunction enjoining and restraining the defendants and each of them, their agents, servants, deputies and attorneys from enforcing or attempting to enforce the aforesaid assessments, and the collection of taxes on said assessments; for removal of cloud from its title by reason of said invalid assessments appearing on the defendant's tax rolls for the year 1950, and that a mandatory injunction be issued compelling the Tax Assessor-Collector to accept the tendered amount in full payment of the taxes due on such properties, or such amount as the Court finds to be correct, based upon the tax rate and rendered values of such properties, if the amount herein stated is incorrect, and to issue this plaintiff its receipt in full for the taxes for the year 1950 for such properties, that upon final hearing said temporary injunction be made permanent and perpetual; that the defendants and each of them, their agents, servants, deputies and attorneys be forever enjoined from attempting to in any manner enforce the purported assessments now appearing to the tax rolls and from in any manner attempting to enforce collection of taxes on the basis of said purported assessments, and for such other and further relief in law or in equity to which it may be entitled and for costs of court."

In the Exhibit "A" referred to in the petition and attached thereto were nine photostatic copies of the rendition of its mineral properties by Humble Oil & Refining Company to Montgomery County, and a copy of its written protest of an increase in its tax valuations dated September 7, 1950.

The first amended original answer of the County and other defendants contained numerous special denials of the various allegations made by Humble, in the first thirty paragraphs of their answer. Their special answer is contained in paragraph thirty-one of the answer, following the

special denials above referred to, and reads as follows:

## "XXXI.

"And for further and special answer herein, if such be necessary, defendants allege that the Commissioners' Court of Montgomery County, sitting as a Board of Equalization for the tax year 1950, honestly and conscientiously sought to equalize valuations on all of the properties in Montgomery County, Texas on the basis of 30% of their reasonable cash market value, or in those cases where there was no reasonable cash market value, for 30% of the real and intrinsic value of such properties; that the orders of the Board of Equalization reflect such a result.

"They further allege that the plaintiff did not at the hearing on September 5, 1950, or at any time prior thereto or subsequent thereto, offer any evidence with respect to the values of its properties. And in this connection defendants allege that in truth and in fact plaintiff's property valuation of which it complains are far less than 30% of its reasonable cash market value or real and intrinsic value, and such valuation so fixed by the Board of plaintiff's properties amounts to approximately 10% of the full value.

"Wherefore defendants, having fully answered herein, pray that the court deny plaintiff's prayer for temporary injunction, permanent injunction and any other relief for which they pray, and that they recover their costs."

The trial court in its judgment and order made numerous findings of fact, substantiating in almost every detail practically all the allegations contained in the petition of the appellee, plaintiff in the trial court. The findings of fact made by the trial court are not made the subject of any attack or complaint by the appellants in their brief. We have read the entire statement of facts and have examined most of the exhibits and have concluded that the evidence fairly supports the findings of fact. From this order and judgment Montgomery County and its various officials have perfected their appeal to this court. At the request of the appellants we have

considered this appeal in advance of other cases submitted prior to its submission, because of the usual precedence which injunction suits enjoy and also because of its importance to the functioning of the county government of Montgomery County.

Upon trial, and in their briefs in this court, the appellants, in conformity with their pleading which we set out above, in the thirty-first paragraph of their amended answer, took the position that even though Montgomery County and its tax gathering officials, Commissioners' Court, Board of Equalization and Tax Assessor-Collector, had by an unwarranted and illegal scheme or process attempted to raise the valuation of the Humble Oil & Refining Company's mineral producing rights from $16,000,000 to $22,000,000, on the assumption and upon proof that said valuation was approximately 33⅓% of its actual value and that all non-mineral property in Montgomery County was valued for tax purposes at a figure which was approximately 10% of its actual value, *nevertheless* Humble Oil & Refining Company on the trial of this case had not shown that it had been harmed thereby because it made no satisfactory proof of the actual market value of its property in Montgomery County; that in truth and in fact said valuation of approximately $22,000,000 placed upon the Humble's Montgomery County mineral producing property by the Board of Equalization was 10% or less of the actual market value of this property; that they, the appellants, had made such actual value of Humble's Montgomery County mineral property a fact issue upon that hearing by the pleading which we have copied and mentioned, their paragraph thirty-one, and that it was the duty of Humble to prove what the actual cash market value of its mineral property was in order to show that it had been damaged by the illegal and unwarranted plan by which the Board of Equalization raised Humble's property valuations; that appellants would have proved, if permitted by the court, that such valuations were in fact less than 10% of the true market value of Humble's mineral property, and therefore Humble had not been hurt by the acts of the Board of Equalization. The trial court, at the in-

stance of appellee and its counsel, declined to permit the appellants to cross-examine the witnesses of the appellee Humble in regard to such actual property valuations, or in regard to how the valuations testified to by such witnesses were determined and arrived at. The trial court also declined to permit the appellants to introduce any testimony regarding the actual cash market value of Humble's mineral producing property in Montgomery County. Appellant tendered in evidence a huge volume of testimony and evidence which was excluded by the trial court. This tendered evidence includes the opinions of experts and an engineering report on the Conroe Oil Field in Montgomery County, Texas by the Conroe Operators Association. This report contains chapters upon production methods, gas production, gas disposal, reservoir pressures, salt water encroachment, proration, well tables and production data, tables in regard to production in various depths of sands, various isobaric maps and other maps and charts showing production curves from the Conroe and other Montgomery County oil fields. Also tendered in evidence was the report of L. D. Webster, Field Engineer, for the Conroe Operators Association, dated December 12, 1949, giving the Conroe Field history, productive areas and the cumulative production data of oil and gas from all the different fields. Incidentally this report shows that of the 971 initial oil wells in the Conroe Field, 879 were producing oil wells, 69 were shut-in or reclassified as gas wells, and 23 were abandoned wells as of January 1, 1948. The rejected evidence also included a report prepared by petroleum engineers and consultants, showing a list of all the leases operated by the Humble Company in the Conroe Field and all the leases operated by Humble in Montgomery County, showing the allowables in production and such wells and leases for the years 1945 through 1950, inclusive. This report is largely compiled from the records of the State Railroad Commission, Oil and Gas Division. The tendered evidence also included an engineering report on the Conroe Field, Montgomery County, by the Conroe Operators Association dated in 1940, another in 1942,

another in 1944, another in 1946, another in 1948, and another as of January 1, 1950. This latter is a 140 page printed report containing various charts, tables, and maps giving detailed information as to the operation of the Conroe Field. The rejected evidence also included the Conroe Field Engineering Committee's original engineering report on the Conroe Field by its Engineering Committee to the Association of Conroe Operators, land and royalty owners, of which original report the above annual reports are annual supplements.

There was tendered also some expert testimony as to the probable life and production period of the Conroe Field, the better wells and the average wells thereof. The experts' calculation was that the Conroe Field initially contained recoverable reserves of approximately 600,000,000 barrels of oil. There was a great deal of such expert testimony contained in the tendered evidence, all of which would have been admissible to show the true market value or cash market value of Humble's mineral producing property in Montgomery County upon January 1, 1950.

The first five points of the appellants are as follows:

1. The trial court erred in granting judgment for appellee in the absence of proof by appellee of the fair market value if its mineral properties.

2. The trial court erred in not holding that proof by appellee of the fair market value of its mineral properties was an essential and indispensable element of appellee's cause of action and was a condition precedent to the sustaining of appellee's charge of discrimination or inequality.

3. The trial court erred in refusing to permit appellants to adduce proof of the fair market value of appellee's mineral properties.

4. The trial court erred in excluding the testimony contained in appellants' Bills of Exception 1 and 2, which testimony pertained to the fair market value of appellee's mineral properties.

5. The trial court erred in not holding that in the absence of proof of the fair market value of its mineral properties, appellee

could not establish, and did not establish, that it was injured by the valuation fixed by the Board of Equalization; and hence in the absence of proof of injury that appellee was not entitled to injunctive relief.

The appellants have four other points of error, relating to ancillary or secondary matters arising on the trial, but we believe that because of our disposition of the appeal upon the basis of the first five points it becomes unnecessary for us to pass upon the other points presented in the brief.

The appellee answers the appellants' Points 1 to 5, inclusive, with its first counter-point, which is as follows: "Where the uncontradicted evidence before the Board of Equalization, including that of the County's own employed evaluation engineers, showed that the proposed assessed valuation of appellee's mineral properties would be from 30% to 35%, and was approximately 33⅓% of the fair market value of such properties; which appraisal was accepted by the Board and concurred in by the representative of appellee as being correct; it was not error for the trial court to refuse to permit appellants to attempt to create an issue in the trial court as to the market value of appellee's mineral properties, there having been no issue or disagreement as to such values at the hearing before the Board of Equalization."

The appellants' Points Nos. 1, 2 and 5 are sustained. There was some testimony before the court in the deposition of the witness R. W. Wood introduced by the appellee, to the effect that the total rendition values of about $54,000,000, plus a 5% raise on that figure, for all the mineral properties of all oil companies in Montgomery County, including Humble, was about one-third of the reasonable cash market value of such properties. There was some evidence in the deposition of the witness J. L. Abbott, introduced by the appellee, that he agreed with the estimate of the witness R. W. Wood. In its brief the appellee quotes these two bits of testimony as being evidence in the record that the $22,000,000 valuation placed upon Humble's property by the Board of Equalization was one-third of the value of all of Humble's mineral property in Montgomery County. This is not proof of the cash market value of the mineral producing property of the appellee in Montgomery County. The appellee made no other proof of the actual cash market value of its mineral property. It argued to the court throughout the trial that it was not required to make such proof, for the reason that in a hearing before the Board of Equalization the one-third figure was agreed to by all parties and that there was no controversy before the Board over the percentage of valuation of the appellee's mineral property and the mineral property of other taxpayers. Since there was no proof made of such actual value we believe the trial court was in error in granting judgment to the appellee in the absence of proof by it of the fair market value of its mineral property and in holding, in effect, that in the absence of such proof the appellee established that it was injured by the increase in valuation and hence was entitled to injunctive relief. We believe the trial court erred in not holding that some proof by the appellee of the fair market value of its mineral property was an essential element of its suit for injunction and such proof was necessary to show discrimination against it by the Board of Equalization, to its injury.

■ In view of the evidence in this record and the findings of fact by the trial court, it is apparent that the Montgomery County Board of Equalization was attempting to raise the property tax valuations of Humble's mineral property in a wrongful manner. It is well established that Humble's mineral property and all other mineral properties in the county were being raised to a tax valuation of about one-third of what the Board assumed to be its market value, and that all of the non-mineral property in Montgomery County was being fixed at about one-tenth of its value. However, such a showing is not sufficient in a suit for injunction against a tax gathering body, such as this suit, to justify the injunctive relief sought. There should have been in addition to these facts some evidence of the cash market value of Humble's mineral property in Montgomery County in order to show that Humble had actually been injured by this attempt on the part of the Board of

Equalization to raise its valuation improperly. Granting that all of the allegations of Humble were substantiated by proof and by the findings by the trial court, nevertheless if as a matter of fact it should develop on the trial of the suit for injunction that, as alleged by the appellants, the actual cash market value of Humble's mineral property was in excess of ten times the valuation of $22,000,000 which was placed upon it by the Board, then there has been no harm or injury to Humble by the action of the Board since its mineral property has been valued at less than ten percent of its true value and since there is adequate proof in the record that the non-mineral property was all assessed at approximately one-tenth of its true market value. We think that the discussion in the opinion in the case of Druesdow v. Baker, by the Commission of Appeals, judgment adopted by the Supreme Court, 229 S.W. 493, 497, is most enlightening upon the basic law questions involved. In that case the receivers of the I. & G. N. Railroad Company brought suit against the Tax Collector, County Judge and County Commissioners of Harris County to restrain collection of taxes. The suit alleged over-valuation by the State Tax Board of its intangible property apportioned by the Board to Harris County. The court said in its opinion, "The constitution simply guarantees uniformity and equality of taxation. It does not purport to deal with the mode or manner of accomplishing this purpose, but its mandate has been satisfied when uniformity and equality of taxation has been attained." The court went on to hold that although from the evidence the tangible property of the railroad company in Harris County was of the value of about $3,200,000 and this property was rendered and assessed at a valuation of about $1,000,000; that the intangible values apportioned to Harris County were about $600,000, making the total taxable values of about $3,800,000 which was assessed at about $1,700,000, or about 45% of their value and that the total property of the railroad company in Harris County, tangible and intangible, was assessed at less than 50% of their value, while other property in the county was assessed at at least 50% of its true value; that under these findings of the trial court, which were supported by the evidence, the railroad company was not entitled to relief. The opinion further stated that the railroad "cannot be heard to say in an equitable proceeding of this sort that the under-valuation of its tangibles by the Board of Equalization is conclusive and cannot be considered in determining whether there has been a discrimination against it, in violation of the uniformity and equality taxation clause of the Constitution." So, in the instant case, the County is not bound in this equitable proceeding by the valuation made by the Board, if it was in fact erroneous.

■ We think the fact that in the hearing before the Board of Equalization there was no issue or contest over the proposed valuations of the mineral properties as being about one-third of the actual market value of such properties cannot be any reason for holding that in a suit for injunction Humble did not have the burden of showing that it had been injured by the acts of the Board complained of, and that such proposed valuation in fact was about one-third of the actual market value of its mineral property. The value of the appellee's property and the value of other properties of other taxpayers in the county is a correct standard by which the trial court and reviewing courts might be able to determine whether there has been a violation of the principle of uniformity and equality of taxation and whether this litigant has been injured by such violation. See: Hunt v. Throckmorton Independent School District, Tex.Civ.App., 59 S.W.2d 470; Lively v. Missouri, K. & T. Railway Co., 102 Tex. 545, 120 S.W. 852; Lufkin Land & Lumber Co. v. Noble, 60 Tex.Civ.App. 30, 127 S.W. 1093, 1096.

■ The appellee under its first counter-point relies upon the simple statement that since the uncontradicted evidence before the Board was that the proposed assessed valuation of its mineral property was approximately 33⅓% of the fair market value of such property, and since such appraisal was accepted by the Board and con-

curred in by it, there was no issue before the trial court as to the market value of its mineral property, since there was no issue or disagreement as to such values at the hearing of the Board of Equalization. It relies upon statements made in various opinions of the appellate courts of this state that the only issue before the court in those cases was whether the action of the Board of Equalization was unlawful. It quotes from various cases which announced the principle that courts have no supervisory control over Boards of Equalization and that no court can substitute its idea of property values for valuations made by a Board of Equalization. This is a correct principle of law, but such statement of principle always includes the idea that the courts cannot substitute their views of the valuation of property for valuations set by Boards of Equalization, for the purpose of taxation. In other words, courts in a suit either for taxes or an injunction to prevent the collection of taxes may not substitute the court's finding of valuation, different from those of the Board, and render judgment for taxation purposes based upon its valuations. This rule, however, does not preclude the court from inquiring into and hearing evidence upon the true value of a litigant's property, when it is necessary to determine (1) whether there has been an action resulting in discrimination or inequality and (2) whether such action has resulted in harm or injury to the complainant. In all the tax cases we have reviewed, the court has heard and considered evidence as to value of the property involved. We think it was necessary here.

▮ The appellants' Points 3 and 4 merely make complaint of the action of the trial court in refusing to permit the appellants to make proof of the fair market value of Humble's mineral property and in excluding testimony contained in its Bills of Exception 1 and 2, which testimony pertained to such fair market value of appellee's mineral property. We sustain these points. After our discussion above, it is evident that we consider the trial court's action in excluding any testimony relating to the market value of Humble's mineral property as being error. We think the basic error of the trial court in this case, which requires a reversal and dissolution of the writs of injunction granted, is the holding that since there was no controversy before the Board of Equalization over the percentage of the valuations as compared to market value, then there could be no issue as to the true market value of Humble's property before the trial court. We do not believe that the trial court could rightfully determine that the Board of Equalization had intentionally discriminated against the appellee in raising the valuation of its mineral property to about one-third of its market value while it allowed the property of other taxpayers to be valued at one-tenth of its market value, without some inquiry into the true market value of the appellee's mineral property. As was said in Lufkin Land & Lumber Co. v. Noble, supra [60 Tex.Civ.App. 30, 127 S.W. 1097], "Of course, in determining these issues, the true market value of the land was an important element, and any evidence that tended to show this was admissible." When the appellee brought suit in the district court of Montgomery County to enjoin the collection of 1950 taxes from it except upon renditions originally made by it, it assumed the burden of showing not only an improper or wrongful plan of raising valuations on the part of the Board of Equalization but also that such plan of action had resulted in injury to it. The true market value of its mineral property should have been shown by the appellee itself. The appellants should have been given the right to make some proof of such value, upon its pleading that the valuation complained of by appellee Humble was actually about ten percent of the true market value.

It follows from what we have said that we believe the judgment of the trial court must be reversed, the writs of injunction dissolved and the case remanded for a new trial, and it is so ordered.