WESTWOOD INDEPENDENT SCHOOL DISTRICT, Appellant,

v.

SOUTHERN CLAY PRODUCTS, INC., Appellee.

No. 1285.

Court of Civil Appeals of Texas, Tyler.

Aug. 8, 1980.

Rehearing Denied Sept. 11, 1980.

Alex Beall, Beall & Crow, Tyler, for appellant.

A. D. Henderson, Palestine, for appellee.

SUMMERS, Chief Justice:

This is a suit for the collection of delinquent taxes. The appeal is from a judgment of the trial court which ruled that the Westwood Independent School District's valuations of personal property belonging to Southern Clay Products, Inc., were grossly excessive.

Plaintiff, Westwood Independent School District (Westwood), brought suit against defendant, Southern Clay Products, Inc. (Southern), for the collection of delinquent taxes, penalty, and interest due and owing for the years 1975, 1976, and 1977 on equipment, machinery, inventory, and other personal property of the defendant located at its plant in Palestine, Anderson County, Texas, within the confines of the Westwood Independent School District. Defendant alleged that the valuations placed upon its inventory, machinery, and equipment by Westwood were grossly excessive. Defendant's first amended original answer alleged that the total valuations that should have been used to establish a reasonable fair market value of all its property are as follows: 1975—$162,850.00; 1976—$162,850.00; 1977—$175,965.63.

Trial was had before the court and jury, and at the conclusion of all the evidence Westwood submitted a motion for a directed verdict, which motion was overruled by the court. No issues were submitted to the jury regarding the assessments for inventory since Westwood's expert witness, H. M. Harris, Jr. admitted in his testimony that the assessed value on inventory was grossly excessive for the years 1974, 1975 and 1976 in that for each of such years the value used for inventory should have been $9,400.00, the same as 1977, as contended by Southern. Special issues were submitted to the jury asking whether the reasonable fair market value established by Westwood on machinery and equipment owned by Southern was grossly excessive, and if such reasonable fair market value was grossly excessive, the amount of such excess. The jury answered the special issues finding that the reasonable fair market value was grossly excessive in the following amounts: for 1975—$175,720.00; for 1976—$159,224.00; for 1977—$79,431.00. The trial court entered judgment in accordance with the jury's answers to said special issues.

A motion for new trial was filed by Westwood alleging that there was no evidence to support the answers to the special issues, or that the evidence was insufficient to establish any grossly excessive valuation, and that the jury was guilty of misconduct in their deliberations in that the jurors considered the total market value of all Southern's property (buildings, machinery, equipment, and inventory) in arriving at market value for machinery and equipment. Said motion therefore alleged that the jurors did not respond to the issues submitted by the court asking for the jury to determine whether the reasonable fair market value on machinery and equipment was grossly excessive. The court overruled the motion for new trial and plaintiff has perfected this appeal.

We affirm.

The record reveals that Southern bought the plant in question in Palestine in 1966

for approximately $93,000.00 but did not begin operating it until 1974. This particular plant receives raw clay and processes it into a rough material which it sells to other companies for the production of ceramic tile. During the first year of operation, Southern did not make a rendition for the value of its property with Westwood's tax office. Westwood employed the firm of Pritchard & Abbott to make appraisals of property within the district. H. M. Harris, Jr. (Harris), an Evaluation Engineer for Pritchard & Abbott, made an appraisal of Southern's property for 1974 tax purposes. A 65% assessment ratio was used in 1974 to compute taxable value of property within the school district. Southern paid the assessed taxes on its property for 1974, but made a notation of protest upon the check.

In 1975, Westwood again employed Pritchard & Abbott to make a valuation study of property within the district. However, the 1975 contract with Pritchard & Abbott stated that at least part of their compensation was to be a percentage of any increased valuation that they might find concerning taxable property within the district. As a result of this study, Westwood increased the appraised valuation of Southern's machinery and equipment. An 85% assessment ratio was used to compute taxable value for 1975. Southern did not make a rendition of its property for 1975 and did not pay the assessed taxes for such year, computed to be $4,489.02.

Harris made an on–site inspection of Southern's property for 1976 tax purposes. This inspection revealed that Southern had added several pieces of machinery and equipment, and therefore the valuation of its machinery and equipment was increased. An 85% assessment ratio was used by Westwood to compute the taxable value of property in 1976. Southern did not make a rendition for 1976 tax purposes and did not pay the assessed taxes for such year, computed to be $4,922.15.

Harris made an on–site inspection of Southern's plant for 1977 tax purposes. Southern did make a rendition of its property for 1977 tax purposes. A representative of Southern appeared at the 1977 Board of Equalization meeting. At a later meeting the Board approved a total value of Southern's property which was higher than the value rendered by Southern but which was lower than the value proposed by Harris. An 85% assessment ratio was used by Westwood to compute the taxable value of property for 1977. Southern did not pay the $4,445.72 in taxes which they had been assessed.

Westwood's points of error nos. 2, 3, 6, 7, 10, and 11 contend that there was no evidence (nos. 2, 6, and 10) or insufficient evidence (nos. 3, 7, and 11) to support the jury's findings that the reasonable fair market value established by Westwood on Southern's machinery and equipment for the years 1975, 1976, and 1977 was grossly excessive.

Westwood's points of error nos. 4, 5, 8, 9, 12, and 13 contend that there was no evidence (nos. 4, 8, and 12) and insufficient evidence (nos. 5, 9, and 13) to support the amount of excessive fair market value found by the jury on Southern's machinery and equipment for the years 1975, 1976, and 1977.

■ In determining these points of error, we are mindful of the rule that in determining a "no evidence" point, which is a question of law, the appellate court will consider only the evidence and inferences which such evidence reasonably permits that will support the challenged findings, disregarding all evidence and inferences to the contrary. *Lukus v. Hartford Accident & Indemnity Co.*, 552 S.W.2d 796, 797 (Tex. 1977); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

■ In determining an "insufficient evidence" point, which is a question of fact, we consider and weigh all the evidence in the case to determine whether the evidence is factually insufficient to support a finding of a vital fact or the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust and that the finding should be set aside and a new trial ordered. *Garza v. Alviar*, supra;

*In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 662 (1951).

Article VIII, section 1 of the Constitution of Texas, Vernon's Ann.Const., provides that taxation shall be equal and uniform and all property shall be taxed in proportion to its value, which shall be ascertained as may be provided by law. The Legislature has provided for the means to enforce the uniform taxation required by the Constitution. Articles 7148 and 7161,[1] provide for the rendition for taxation by the taxpayer, of the value of merchandise and personal property in his hands sometime after January 1 of each year. Article 7193 provides that the assessor of taxes shall assess the property for the taxpayer, if he fails to render it. Article 7212 provides for a board of equalization to supervise and equalize the assessment of taxes, and to fix the final valuation. Article 1060a makes the above statutes applicable to municipal corporations and school districts. Thus, to insure the uniformity in taxation the boards of equalization have been established as the final equalizing factor.

In *State v. Whittenburg*, 153 Tex. 205, 265 S.W.2d 569, 572–573 (1954), the following controlling principles were stated:

"It is now well settled that the assessment of property for tax purposes is a quasi–judicial function of boards of equalization and that no attack on valuations fixed by such boards can or will be sustained in the absence of proof of fraud, want of jurisdiction, illegality, or the adoption of an arbitrary and fundamentally erroneous plan or scheme of valuation. *State v. Houser*, 138 Tex. 28, 156 S.W.2d 968, 970–971; *Druesdow v. Baker*, Tex.Com.App., 229 S.W. 493, 495. Moreover, when their official action is attacked it will be presumed that such boards discharged their duties as public agencies according to law and acted in good faith. *Zachary v. City of Uvalde*, Tex.Com.App., 42 S.W.2d 417; *Lubbock Hotel Co. v. Lubbock Ind. School Dist.*, Tex.Civ.App., 85 S.W.2d 776, no writ; *Hinkson v. Lorenzo Ind. School Dist.*, Tex.Civ.App., 109 S.W.2d 1008, writ dism.

"While it has been held that a grossly excessive valuation may, in law, be sufficient to establish such fraud or illegality as to render a valuation void, *Johnson v. Holland*, 17 Tex.Civ.App. 210, 43 S.W. 71, writ denied; *City of Sweetwater v. Biard Development Co.*, Tex.Civ.App., 203 S.W. 801, no writ; *Simkins v. City of Corsicana*, Tex.Civ.App., 86 S.W.2d 792, no writ; *Howth v. French Ind. School Dist.*, Tex. Civ.App., 115 S.W.2d 1036; *French Ind. School Dist. v. Howth*, 134 Tex. 211, 134 S.W.2d 1036, it is held with equal emphasis that mere errors in judgment or the fact that a trial judge or jury differs with the valuation fixed will not suffice as a basis for avoiding the board's action. *Simkins v. City of Corsicana*, supra; *Druesdow v. Baker*, supra; *State v. Houser*, supra."

■ In cases such as this, where it is contended that the valuations are excessive, the court hears and considers evidence as to the value for the purposes of determining whether the property has been so grossly overvalued as to result in harm or injury to the complainant. *Pierce v. City of Jacksonville*, 403 S.W.2d 512 (Tex.Civ.App.—Tyler 1966, writ ref'd n. r. e.); *Montgomery County v. Humble Oil & Refining Co.*, 245 S.W.2d 326 (Tex.Civ.App.—Beaumont 1951, writ ref'd n. r. e.).

■ Before the valuation can be said to be grossly excessive, the assessed value must be so far above the fair cash market value as to shock a correct mind and thereby raise a presumption that the valuation was fraudulent or does not represent a fair and conscientious effort on the part of the board to arrive at the fair cash market value. *Pierce v. City of Jacksonville*, supra; *Lubbock Hotel Co. v. Lubbock Ind. School District*, supra; *Richardson v. Kent*, 47 S.W.2d 420 (Tex.Civ.App.—Dallas 1932, no writ).

---

1. These and all other statutory references are to Vernon's Annotated Texas Civil Statutes unless otherwise noted.

The record reveals that for 1974 tax purposes Westwood, with the help of Pritchard & Abbott, determined the market value for all of Southern's property to be $250,540.00. A. K. Monroe, Tax Assessor for Westwood, testified that if this total was broken down, the value of buildings was $60,840.00; the value of machinery and equipment was $120,300.00; the value of mobile machinery and equipment was $4,400.00; and the value of inventory was $65,000.00.

The record reveals that for 1975 tax purposes Westwood determined the market value for all of Southern's property to be $391,200.00. Monroe stated that the value of machinery and equipment for 1975 was increased by $120,600.00 for a total value of $240,960.00. The record reveals that Harris made an on–site inspection of Southern's plant, and the value of Southern's machinery and equipment was increased for 1975 because during 1974 they had added a rotary dryer, a separator, incline conveyors, hoppers, and a settling pond.

Westwood contends that there is no other evidence anywhere in the record tending to establish a fair market value of Southern's machinery and equipment of any amount different from $240,960.00. We cannot agree.

Southern's basic contention is that the $120,660.00 increase in the value of machinery and equipment for 1975 was grossly excessive and therefore the total valuation which Westwood made of Southern's machinery and equipment was grossly excessive.

David Christian, vice president of Southern, testified that in 1975 Southern purchased three (3) dryers, a shredder, two buildings, two loaders, a truck, electrical equipment, and all the conveyors for $17,-000.00 from a company in Wharton, Texas. He further testified that the wet scrubber (separator) was purchased new from W. W. Sly (phon) at a cost of approximately $9,000.00. He said that the settling pond was made by a D–8 caterpillar which was owned by Southern. The going rate for rental of a similar caterpillar was $30.00 per hour and it took half a day to finish the

pond, thereby giving it an approximate cost of $150.00. It was Christian's opinion that the improvements listed for 1975 could not have increased the value of Southern's equipment and machinery by $120,600.00; instead, he said $15,000.00 would be a reasonable fair market value for the added improvements.

Harry J. Hubner, Regional Manager for Combustion Engineering, testified that he did inspect Southern's Palestine plant on the morning of the trial; that his company manufactures some of the equipment or similar equipment to that used by Southern; that he looked at all of the machinery and equipment at the plant, but his main interest was in the shredder mill; and that in his opinion $240,960.00 (valuation for 1975) was not a reasonable value for the machinery and equipment.

Harris testified that he felt $98,000.00 should have been the amount of the increase because two silos, which Southern did not own, were included in the valuation for 1975.

The record reveals that for 1976 tax purposes Harris made an on–site inspection of Southern's property and found that sometime during the previous year an auger had been added beneath the truck dump. He valued this addition to the machinery and equipment at $2,730.00. Monroe testified that in 1976 Westwood used basically the same value for machinery and equipment as they used in 1975, plus the value of any additions made during the new year. He further testified that for 1976 tax purposes Westwood valued Southern's machinery and equipment at $243,690.00, and all of Southern's property was valued at $393,930.00.

Westwood again contends that there was no other evidence of the value of Southern's machinery and equipment for 1976 tax purposes. We cannot agree.

Southern did not offer any evidence to dispute the value which Westwood placed upon the auger. However, as we have already pointed out Monroe testified that in 1976, Westwood used basically the same value for machinery and equipment as they

used in 1975, plus the value of any additions made during the new year. Therefore, Westwood used the $240,960.00 value for machinery and equipment in 1975 and added $2,730.00 to it for the 1976 value. The resulting value is $243,690.00 for machinery and equipment in 1976. As shown in our discussion of 1975 values, Southern offered evidence that the $240,960.00 valuation for its machinery and equipment in 1975 was grossly excessive.

Westwood contends that neither party offered any evidence as to the value of Southern's machinery and equipment for 1977 tax purposes, and therefore there was no evidence that the value placed on Southern's machinery and equipment for such year was grossly excessive. We cannot agree.

Harris testified that he made an on–site inspection of Southern's plant for 1977 tax purposes and found that a retainer wall and a 12–inch screw conveyor had been added during the previous year. He valued these improvements at $3,700.00.

Southern did not offer any evidence as to the value of the screw conveyer and the retainer wall. However, Monroe testified that Westwood, in 1977, also used basically the same values for machinery and equipment as they had in 1975, plus any additions since that time. Therefore, Westwood used the $240,960.00 value from 1975, added $2,730.00 (the value of the auger), and added $3,700.00 (the value of the screw conveyor and the retainer wall). The resulting value for machinery and equipment in 1977 would be $247,390.00. As we have already stated, Southern did offer evidence that the $240,960.00 value used in 1975 was grossly excessive.

Harris testified that a value of $403,140.00 for all of Southern's property was recommended by Pritchard & Abbott to the Board of Equalization in 1977. Monroe testified to the effect that a value of $341,376.00 was used by Westwood as the value of all of Southern's property for 1977 tax purposes.[2] Southern made a rendition of all its property to the Board that year for $175,965.63. Machinery and equipment made up $140,537.00 of this total rendition. Christian testified at the board meeting, but the Board made no decision as to the valuation of Southern's property at this meeting. At a later meeting the Board approved a $290,177.00 valuation for all of Southern's property.

Christian testified that although Southern rendered its machinery and equipment for $140,537.00 (1977 rendition), he felt this was a little high and that the true fair market value was between $75,000.00 and $100,000.00. Hubner testified that he has had occasion to see fifty or sixty plants similar to that of Southern's sold during his lifetime. He further testified that about a year before trial he saw a plant in Arkansas that was about the same size as Southern's plant and that the whole plant sold for $75,000.00

Hubner stated that Southern's mill (a part of machinery and equipment) was made in 1929; that it was not in good shape and needed extensive repairs; that he would classify it was a "home–made" mill; that a new mill about the same size as Southern's would cost about $105,000.00; and that the reasonable value of the mill is between $8,000.00 to $10,000.00. He also stated that the Arkansas plant which was sold last year had a mill and the mill was valued at $10,000.00, but it was sold as part of the whole plant facility. Hubner testified that he inspected Southern's dryer; that it is not a commercially marketable dryer; that a new rotary dryer, as might be used in an operation such as Southern's, would have a cost of $75,000.00 or $80,000.00 at the present time; that the cost of this type of equipment has been appreciating about 10% a year; and that five years ago a new rotary dryer might have cost $30,000.00 to $40,000.00. It was Hubner's opinion that the reasonable market value of all of Southern's machinery and equipment was $100,000.00.

2. Monroe actually stated that an assessed value of $290,170.00 was used by Westwood in 1977 for all of Southern's property; this figure represented 85% (assessment ratio) of the total valuation.

Harris testified that although he has made five or six heavy industrial appraisals per year for Westwood, he has never had occasion to do an evaluation study of any other plant similar to Southern's that puts out this raw–clay product. He also testified that he has never participated in, or known anything about, the sale of a plant that is similar to Southern's. He further testified that he met Hubner one time before trial when he was trying to get some up–to–date information on Raymond mills and rotary dryers. He stated that he did ask Mr. Hubner about the cost of a new Raymond mill and got some literature on it. Harris tried to price a Raymond mill and found that it would sell in Chicago for $100,000.00 f. o. b. Chicago, installed with electricity, the motors, and gears operating. Westwood used approximately one half of what a new mill would cost or $55,000.00 as a value of Southern's mill. However, in figuring the value of the mill, Harris stated that they were also taking into consideration the mill as part of an operating plant, not just a piece of machinery. To get the value of an operating entity requires consideration of what a willing buyer would buy it for and what a willing seller would sell it for. However, the age of the machinery and equipment would affect the market value of an operating entity. Harris stated that he did not have an opinion as to the average age of the machinery and equipment at Southern's plant. He also stated that when Southern bought the plant, the parts to the dryer were there, but they were not assembled or operating.

Westwood contends throughout all these points of error that since Southern did not offer any evidence of what the value of its machinery and equipment was on January 1 of each of the years in question, the jury's answers are unsubstantiated. We cannot agree.

Westwood offered evidence of the values it used in determining Southern's taxes as of January 1 of each year in question. These values represented the values used by Westwood as of January 1 of the previous years plus any additions made after that. Also, Westwood's values as of January 1 were based upon on–site inspections made sometime during the previous year and reflected increases for any additions. The evidence offered by Southern took into account the very same equipment and machinery additions, and therefore gave the jury a means of comparing conflicting values for the same equipment during the same period of time.

Westwood does not cite authority for its contention that the taxpayer must offer evidence of the value of its machinery and equipment as of January 1 for each year. Furthermore, we have been unable to find any authority to support this contention.

In *Campbell v. City of Houston*, 464 S.W.2d 372 (Tex.Civ.App.–Houston [14th Dist.] 1971, no writ hist.), the following statement appears:

In order to prove the defense of grossly excessive valuation, appellant was required to offer testimony as to the market value of his property at the appropriate times in order that the trial court might be afforded a basis to conclude whether there was such a wide difference between market value and the assessed value as would "shock a correct mind." See *Houston Crane Rentals, Inc. v. City of Houston*, 454 S.W.2d 216 (Tex.Civ.App. 1970), writ ref., n. r. e.; *Pierce v. City of Jacksonville*, 403 S.W.2d 512, 517 (Tex. Civ.App.1966), writ ref., n. r. e. And see *City of Waco v. Conlee Seed Company*, 449 S.W.2d 29 (Tex.Sup.1969).

■ The court in *Campbell* did not elaborate on the meaning of "appropriate times," but it did not state that the taxpayer was required to offer testimony as to the market value of his property as of January 1 of each year. Instead, the court emphasizes that the taxpayer must offer testimony of value so that the trial court might be afforded a basis to compare market value and assessed value. Therefore, we are of the opinion that this rule requires evidence of values for identical items in the same periods of time.

■ We feel this objection lacks merit for another reason. The special issues con-

tained in the trial court's charge refer to values for the year 1975, the year 1976, and the year 1977 without any specific reference to January 1 of each year. Westwood made no objections to the trial court's charge upon that basis, and the record does not show that Westwood requested or submitted any special issues about the market value of Southern's property on January 1 of each year, *Cannon v. Canida*, 321 S.W.2d 631 (Tex.Civ.App.—Texarkana 1959, writ ref'd n. r. e.). Therefore, under Rule 272, Texas Rules of Civil Procedure, Westwood waived this objection and cannot now on appeal assert this as a ground for reversal.

Throughout Westwood's points of error they argue that there was no direct testimony of what the fair market value of the properties in question would be after deducting the grossly excessive amount from the valuations used by Westwood and that Christian's testimony appeared to be contradictory. Therefore, Westwood contends that there was no evidence to support the jury's findings. We cannot agree.

It was the jury's province to weigh all the evidence and decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." *Dodd v. Texas Farm Products Co.*, 576 S.W.2d 812, 815 (Tex.1979); *Lockley v. Page*, 142 Tex. 594, 180 S.W.2d 616, 618 (1944); *Stephenville, N. & S. T. R. Co. v. Shelton*, 208 S.W. 915, 916 (Tex.Comm'n App.1919).

In *Houston Lumber Supply Company v. Wockenfuss*, 386 S.W.2d 330 (Tex.Civ.App.–Houston 1965, writ ref'd n. r. e.), the court had the following to say where the jury found values in between the maximum and minimum valuation placed on the property by experts which is as follows:

> The testimony of expert witnesses is not ordinarily binding on the jury, and is not in this case. *City of Houston v. Hendrix*, Tex.Civ.App., 374 S.W.2d 764, writ ref., n. r. e.; *State v. Haire*, Tex.Civ.App., 334 S.W.2d 488, writ ref., n. r. e. . . .

Neither the minimum nor the maximum valuation placed on property by the opinion testimony of expert witnesses is binding on a jury. The jury is entitled to weigh the testimony of such witnesses in the light of their own knowledge and experience. *Slay v. Mary Couts Burnett Trust*, Tex.Civ.App., 180 S.W.2d 480, aff'd in part and rev. in part, 143 Tex. 621, 187 S.W.2d 377; *Barclay v. Burge*, Tex.Civ. App., 245 S.W.2d 1021; *City of Houston v. Hendrix*, supra.

■ In the present case the jury heard testimony from both sides concerning the market value of Southern's machinery and equipment. The jury was not bound by the witnesses' opinions as to value, but could find values different from those in the testimony. That being the case, there might not be any direct testimony as to the market value after deducting the grossly excessive amount, but there was evidence to support the jury's findings.

After a review of the entire record, we cannot agree with Westwood's contention that there was no evidence or insufficient evidence to support the jury's answers to the special issues. Westwood's points of error 2 through 13 are overruled.

Westwood's first point of error contends that the trial court should have granted its motion for directed verdict because Southern did not discharge its burden of proof. Westwood cites extensive authority to show that it established a prima facie case for the recovery of Southern's delinquent taxes and that Southern had a "very heavy and onerous burden" to overcome Westwood's prima facie case. Southern does not dispute that Westwood established a prima facie case or the degree of its burden of proof. Southern instead relies on the defense of grossly excessive valuation and contends that it has discharged its burden of proof under this defense. The remainder of Westwood's argument under this point of error reiterates the same contentions that appear in its points 2 through 13. Having already discussed these contentions, we feel no further discussion is necessary, and Westwood's first point of error is overruled.

Westwood's point of error 14 alleges that the trial court erred in denying its motion for new trial.

The record reveals that Westwood filed a motion for new trial alleging among other things jury misconduct. There was no affidavit of any sort attached to said motion. Westwood then filed an amended motion for new trial, alleging jury misconduct, with an unsworn letter from the jury foreman, Bob Henderson, attached. This letter purported to set out the mathematical calculations and formulas used by the jury in determining the reasonable fair market value of Southern's machinery and equipment, and the amount of the grossly excessive value placed on Southern's machinery and equipment by Westwood. At the hearing on the motion for new trial, the trial court judge sustained Southern's objection to Bob Henderson's testimony about the jury's mathematical calculations. The trial court did permit Mr. Henderson to be examined for purposes of Westwood's bill of exceptions. He testified as to the mathematical calculations and formulas by which he said the jury determined the reasonable fair market value of Southern's machinery and equipment. Mr. Henderson was the only juror who testified. Thereafter, the trial court overruled Westwood's motion for new trial.

Westwood argues that it is obvious from Bob Henderson's letter and his testimony at the hearing on motion for new trial that the jurors went outside the evidence; determined their own reasonable fair market value of buildings, machinery and equipment, inventory and other personalty owned by Southern which was outside of and beyond the scope of the special issues submitted to the jury by the court; and from such determination calculated the figures to be used in answering the special issues submitted to the court. Therefore, Westwood contends that the trial court should have granted its motion for new trial. We cannot agree.

Westwood, by raising the issue of jury misconduct has invoked the application of Tex.R.Civ.P. 327. Under this rule, the court's refusal to hear testimony of misconduct was clearly a matter involving the exercise of sound judicial discretion. *Roy Jones Lumber Co. v. Murphy*, 139 Tex. 478, 163 S.W.2d 644 (1942); *Cortez v. Medical Protective Co. of Ft. Wayne*, 560 S.W.2d 132, 138 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n. r. e.); *O'Neill v. Craig*, 493 S.W.2d 898, 903 (Tex.Civ.App.–Corpus Christi 1973), cert. denied, 415 U.S. 919, 94 S.Ct. 1418, 39 L.Ed.2d 474 (1974). We are mindful of the rule that the trial court is not required to hear evidence upon a motion or affidavits which are on their face insufficient because they do not show any overt act of misconduct and the allegations relate to the reasoning process by which the jury arrived at their verdict. *Allala v. A. N. Tandy & Sons*, 127 Tex. 148, 92 S.W.2d 227, 228 (1936); *Cortez v. Medical Protective Co. of Ft. Wayne*, supra; *Griffith v. Hudspeth*, 378 S.W.2d 153, 156 (Tex.Civ.App.–San Antonio 1964, no writ); *Pete–Rae Development Co. v. State*, 353 S.W.2d 324, 326 (Tex.Civ.App.–Eastland 1962, writ ref'd n. r. e.); *Zamora v. Zamora*, 260 S.W.2d 604, 605 (Tex.Civ.App.–San Antonio 1953, writ ref'd).

We believe that Westwood is inquiring into the mental process of the jurors rather than alleging some overt act by the jurors constituting jury misconduct. 56 Tex. Jur.2d Trial sec. 344, p. 709 (1964). We have reviewed the testimony listed from Mr. Henderson along with his letter and concluded that such relates only to the mathematical, mental reasoning process used by the jury in reaching their verdict. Such testimony was a result of direct inquiry into the mental processes of the jurors concerned and therefore cannot be considered by the trial or appellate courts in determining the probable effect of misconduct upon the verdict of the jury. *Mrs. Baird's Bread Company v. Hearn*, 157 Tex. 159, 300 S.W.2d 646 (1957); *Putman v. Lazarus*, 156 Tex. 154, 293 S.W.2d 493 (1956); *Lanphier Const. Co. v. Fowco Co.*, 523 S.W.2d 29, 36 (Tex.Civ.App.–Corpus Christi 1975, writ ref'd n. r. e.); *Fields v. Worsham*, 476 S.W.2d 421 (Tex.Civ.App.–Dallas 1972, writ ref'd n. r. e.); *Hanover Insurance Company v. Hoch*, 469 S.W.2d 717 (Tex.Civ.

App.–Corpus Christi 1971, writ ref'd n. r. e.).

The trial court, by overruling Westwood's motion for new trial, impliedly found that the misconduct did not occur. Such implied finding, we believe, is supported by the evidence and is binding on the appellate courts. *Brawley v. Bowen*, 387 S.W.2d 383 (Tex.1965); *State v. O'Dowd*, 158 Tex. 348, 312 S.W.2d 217 (1958). Westwood's fourteenth point of error is overruled.

■ By cross–point, Southern complains of error by the court in rendering judgment based upon the answers by the jury to Special Issues Nos. 5 and 6, whereas the judgment should have been based upon the amount of the rendition by Southern for the year 1977 upon the machinery and equipment.

Appellee's cross–point cannot be considered for the reason that the transcript does not show that appellee advised the trial court in any manner of its dissatisfaction with the judgment. *West Texas Utilities Company v. Irvin*, 161 Tex. 5, 336 S.W.2d 609 (1960); *Rutherford v. Holmes*, 599 S.W.2d 668 (Tex.Civ.App.–Austin 1980, no writ); *White Stores, Inc. v. Crain*, 515 S.W.2d 677 (Tex.Civ.App.–Austin 1974, no writ); *Bituminous Casualty Corporation v. Martin*, 478 S.W.2d 206 (Tex.Civ.App.–El Paso 1972, ref'd n. r. e.); *Edgar v. Schmidt*, 243 S.W.2d 414, 417 (Tex.Civ.App.–Austin 1951, no writ); Appellate Procedure in Texas, sec. 15.16 (2d ed. 1979); see *Dietz v. Dietz*, 540 S.W.2d 418 (Tex.Civ.App.–El Paso 1976, no writ) for other authorities and for a criticism of the rule.

Having considered all of appellant's points of error and appellee's cross–point and finding them to be without merit, the judgment of the trial court is affirmed.