**In re FAIRCHILD AIRCRAFT CORP., Debtor.**

**Bankruptcy No. 90–50257–C.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Jan. 22, 1991.

---

490

Joel P. Kay, Houston, Tex., for trustee.

Robert E. Etlinger, San Antonio, Tex., for Bexar Cty. Appraisal Dist.

## ORDER ON MOTION FOR DETERMINATION OF PROPERTY TAX LIABILITY

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the motion of Bettina M. Whyte, Chapter 11 Trustee for Determination of Property Tax Liability. Upon consideration thereof, the court finds and concludes as follows:

### JURISDICTION

 This Court has jurisdiction to hear and determine the Motion as a core proceeding pursuant to 28 U.S.C. §§ 1334(a), 157(b)(2), and 11 U.S.C. § 505(a)(1). Section 505(a)(2) of Title 11 precludes this court from making a determination of the type sought here provided the amount of legality of the tax "... was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case ..." 11 U.S.C. § 505(a)(2)(A). A notice of protest was filed by the chapter 11 trustee in the spring of this year, but that was *after* the commencement of the case. Section 505(a)(2)(A) has no application to such *post-petition* adjudications. 11 U.S.C. § 505(a)(2)(A).

The taxing authorities also urge abstention, citing what they believe to be controlling Supreme Court authority. *Arkansas Corp. Commission v. Thompson*, 313 U.S. 132, 142–43, 61 S.Ct. 888, 891–92, 85 L.Ed. 1244 (1941). They point out that the notice of protest resulted in a formal hearing before the Appraisal Review Board, and that, even though the chapter 11 trustee did not actively participate in this hearing, opting instead for a final adjudication in this forum by filing this motion under Section 505(a), the Board nonetheless made what the taxing authorities now contend should be treated as a binding determination at the conclusion of that hearing. *See Arkansas Corp. Commission, supra* at 143, 61 S.Ct. at 891–92.

*Arkansas Corp. Commission* is not controlling. First of all, the Bankruptcy Act was subsequently amended to overrule that precedent, insofar as it affected post-petition adjudications. *See* Bankruptcy Act, § 2(a); *City of Amarillo v. Eakens*, 399 F.2d 541, 543 (5th Cir.1968), *cert. den.*, 393 U.S. 1051, 89 S.Ct. 688, 21 L.Ed.2d 692 (1969). The statutory language was carried forward into the Bankruptcy Code, with only minor modifications. H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

Today, abstention from deciding a tax adjudication question under Section 505 is only appropriate upon a showing that uniformity of assessment is of significant importance. H.R.Rep. No. 595, *supra* at 356; *In re Diez*, 45 B.R. 137, 139 (Bankr.S.D.Fla.1984). No such showing has been made here. If the tax *rate* were the subject of this motion, perhaps abstention might be appropriate. Because the trustee only challenges the excessiveness of the appraisal district's valuation of the estate's property, the taxes to be paid by other taxpayers will not be affected, nor will uniformity of assessment be placed in issue (i.e., the overall valuation methodology used by the appraisal district is not being generally attacked). Because uniformity of assessment is not at issue, the taxing

authorities' arguments on this point must be rejected.

■ Of course, the court would not be *precluded* from abstaining, pursuant to 28 U.S.C. § 1334(b)(1) (permissive abstention). However, this court has already issued one decision in this case on precisely this issue to the effect that a bankruptcy court should not exercise permissive abstention where the trustee has affirmatively elected the forum to which she is otherwise legally entitled. *See Baumgart, et al. v. Fairchild Aircraft Corp., et al. (In re Fairchild Aircraft Corp.),* Case Nos. 90–5131–C through 90–5147–C, slip op., 1990 WL 119650 (Bankr.W.D.Tex. June 12, 1990), *recommend. adopted,* (W.D.Tex. 1990). That decision will control as law of the case here and the court will accordingly not abstain.

■ The taxing authorities also contend that this court cannot adjust property values under Section 505(a), arguing that the valuation process is handled by an appraisal district which does not itself set, assess or levy property taxes. The taxing authorities again cite for support the Supreme Court's decision in *Arkansas Corp. Commission v. Thompson.* That case is inapposite, however, as the property values there had in fact been contested and determined before a quasi-judicial agency *prior* to bankruptcy, a factor which the Court found to be controlling. *Id.* at 142–43, 61 S.Ct. at 891–92. Here, by contrast, those values have yet to be contested.[1] The Fifth Circuit, in a case much closer to our facts, held that the bankruptcy court *could* determine property values for purposes of determining tax liability, provided such values had not been fixed prepetition. *City of Amarillo v. Eakens,* 399 F.2d at 543; *see also City Vending of Muskogee v. Okla-*

*homa Tax Comm.,* 898 F.2d 122 (10th Cir. 1990) (to the same effect).

Simple logic demonstrates that property tax valuation is in fact a two-part process, consisting of both valuation and tax rate adjustment. That the state authorities have delegated these functions to two different agencies does not alter the fact that both functions make up the single task of determining the amount and legality of a given tax. In fact, only rarely do taxpayers individually contest the *rates* of taxation. More frequently, they attack the valuation of their property.[2] The use of Section 505 to, in effect, remove only that valuation adjudication stage to the bankruptcy court is entirely consistent with the intended function of that section and does not undermine the state property taxation process. *See City of Amarillo v. Eakens,* 399 F.2d at 544 (affirming bankruptcy referee's determination of tax liability via reconsideration of the valuation of the property taxed). This jurisdictional attack is thus rejected as well.

## THE LAW OF THE CASE

■ The valuation of property for purposes of determining property taxes must be consistent with state law principles, as the valuation is merely part and parcel of the adjudication of the tax due and owing, a question controlled by state law. The valuation law with which bankruptcy courts are most familiar (that arising out of Section 506(a) and the case law which construes the application of that section) does not here apply. Instead, the bankruptcy court gives full faith and credit to the law of the state upon which the tax is based. *Arkansas Corp. Commission v. Thompson,* 313 U.S. 132, 142, 61 S.Ct. 888, 891, 85 L.Ed. 1244 (1941) ("manifestly, whether or not taxes are 'legally due and

---

1. Recall that the trustee intentionally did not participate in the hearing before the Appraisal Review Board.

2. Taxpayers cannot unilaterally attack tax rates applied to them individually. These rates are usually the subject of public hearings. TEX. PROP.TAX CODE, §§ 26.05, 26.06 (Vernon 1982 & Supp.1990). Once set, they must apply uniformly to all taxpayers in the jurisdiction. *Id.,*

§ 26.05. Any change in the rate would affect the taxes owed by other taxpayers in the county. Objections to excessive valuations, on the other hand, are property specific and can usually be challenged without threatening the validity of taxes assessed against everyone else, so long as the challenge would not require revaluation of an entire class of taxpayers' property.

owing' to a state depends upon the valid laws of the state"); *In re Pine Knob Investments,* 20 B.R. 714, 716 (Bankr.E.D. Mich.1982); *see In re Ishpeming Hotel Co.,* 70 B.R. 629, 633 (Bankr.W.D.Mich.1986).[3] We turn then to Texas state law.

The Texas Property Tax Code sets the standards for the appraisal of property for tax purposes. In general, "all taxable property is appraised at its *market value* as of January 1." TEX.PROP.TAX CODE, § 23.01(a) (Vernon 1982) (emphasis added). Adds the statute:

> The market value of property shall be determined by the application of *generally accepted appraisal techniques,* and the same or similar appraisal techniques shall be used in appraising the same or similar kinds of property. However, each property shall be appraised based upon the individual characteristics that affect the property's market value.

TEX.PROP.TAX CODE, § 23.01(b) (Vernon Supp.1990) (emphasis added). Market value is itself defined as

> ... the price at which a property would transfer for cash or its equivalent under prevailing market conditions if:
>
> (A) exposed for sale in the open market with a reasonable time for the seller to find a purchaser;
>
> (B) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and
>
> (C) both the seller and the purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other.

TEX.PROP.TAX CODE, § 1.04(7) (Vernon 1982). These property tax code provisions implement a provision of the Texas Constitution that requires all property to be taxed in proportion to its value. TEX. CONST., Art. VIII, § 1; *Parker County v. Spindle-*

*top Oil & Gas Co.,* 628 S.W.2d 765, 767 (Tex.1982).

Texas property tax code provisions also provide that "intangible personal property is not taxable ..." TEX.PROP.TAX CODE, § 11.02 (Vernon 1982 & Supp.1990). Intangible personal property is further defined as

> ... a claim, interest (other than an interest in tangible personal property), right, or other thing that has value but cannot be seen, felt, weighed, measured, or otherwise perceived by the senses, although its existence may be perceived by a document. It includes a stock, bond, note or account receivable, franchise, license or permit, demand or time deposit, certificate of deposit, share account, share certificate account, insurance policy, annuity, pension, cause of action, contract, and goodwill.

TEX.PROP.TAX CODE, § 1.04(6) (Vernon 1982).

The market value of inventory is "the price for which it would sell as a unit to a purchaser who would continue the business." TEX.PROP.TAX CODE, § 23.12(a) (Vernon Supp.1990). Uniform procedures are mandated for the purpose of determining the quantity of inventory, but valuation is mandated to be derived by applying "generally accepted appraisal techniques." *Id.,* § 23.12(c).

In contesting an allegedly excessive valuation (as here), the taxpayer must prove that the valuation placed upon the property for tax purposes is "grossly excessive," i.e., so far above the fair cash market value as to shock a correct mind, such that it does not represent a fair and conscientious effort on the part of the appraisal district to arrive at a fair cash market value. *Pierce v. City of Jacksonville,* 403 S.W.2d 512, 517 (Tex.Civ.App.—Tyler 1966, writ ref'd n.r.e.); *Westwood Ind. School Dist. v. Southern Clay Products,*

---

**3.** Full faith and credit applies to the substantive aspects of Texas law, not to its procedural aspects. 2 MOORE'S FED.PRACT. ¶ 1.04[4] (Matthew Bender 1989); *see Erie v. Tompkins,* 304 U.S. 64, 78–80, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938). Texas statutory and case law authority mandating that certain procedural steps constitute the exclusive procedure by which property tax valuations may be contested are of course preempted by the provisions of the Bankruptcy Code. U.S. CONST., Art. VI.

*Inc.*, 604 S.W.2d 511, 515 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.). Reasonable discrepancies between true value and assessed value will be tolerated by Texas courts. *Corrigan Properties, Inc. v. City of West University Place*, 430 S.W.2d 917, 921 (Tex.Civ.App.—Houston [1st Dist.] 1968, no writ); *Houston Shoe Hospital v. State*, 423 S.W.2d 624, 626 (Tex.Civ.App.—Houston [14th Dist.] 1968, no writ); *Conlee Seed Co. v. City of Waco*, 434 S.W.2d 214, 216 (Tex.Civ.App.—Waco 1968), *aff'd* 449 S.W.2d 29, 32 (1969). Variances of from 33% to 75% have been found to be grossly excessive for purposes of the rule. *Corrigan Properties, supra* at 921. It is also permissible to estimate one of the various elements used in determining the overall valuation. *Electra Independent School District v. Waggoner Estate*, 140 Tex. 483, 168 S.W.2d 645 (1943).

By the same token, taxing authorities are not authorized to assess property without regard to its fair market value. *Parker County v. Spindletop Oil & Gas Co.*, 612 S.W.2d 944, 948 (Tex.Civ.App.—Fort Worth 1981), *aff'd in part and rev'd in part (on other grounds)*, 628 S.W.2d 765, 768 (Tex.1982). Conditions developing after January 1 of the tax year in question cannot be considered in the valuation process. *Kirby v. Transcontinental Oil Co.*, 33 S.W.2d 472, 474 (Tex.Civ.App.—Waco 1931, writ ref'd). Prospective value, in the sense of value at some future time, cannot legitimately be made the basis of determination of present value. *Arlington v. Cannon*, 263 S.W.2d 299, 305 (Tex.Civ. App.—Ft. Worth 1953), *aff'd in part and rev'd in part (on other grounds )*, 153 Tex. 566, 271 S.W.2d 414 (1954). Arbitrary valuation techniques are specifically prohibited. *Howth v. French Ind. School Dist.*, 115 S.W.2d 1036, 1039 (Tex.Civ.App.—Beaumont 1938), *aff'd*, 134 Tex. 211, 134 S.W.2d 1036 (1940); *Duffey v. Union Hill Ind. School Dist.*, 490 S.W.2d 201, 204 (Tex.Civ.App.—Texarkana 1973, writ ref'd n.r.e.).

Upon determination of the tax claims in accordance with the foregoing principles, the taxing authorities will hold priority claims against the estate under Section 507(a)(1), not (a)(7). *United States v. Friendship College, Inc.*, 737 F.2d 430, 432 (4th Cir.1984). This is so because Section 507(a)(7)(B) applies only to property taxes assessed *before* the commencement of the case.

Property taxes in Texas are assessed *as of* January 1 of a given year, but the assessment does not take place until October 1 of that year. The tax rate is not required to be set until September 1 of the current tax year. TEX.PROP.TAX CODE, § 26.05(a) (Vernon Supp.1990). Not until the assessor has received the notice of the tax rate for the current year may it calculate the tax to be imposed on a given property. TEX.PROP.TAX CODE, § 26.09 (Vernon 1982 & Supp.1990). The term "assessed" used in Section 507(a)(7)(B) refers to this *act* of assessment, rather than to the effective date of assessment. *See Matter of Stroud Wholesale, Inc.*, 37 B.R. 735, 741 (Bankr.E.D.N.C.1984), *rev'd in part on other grounds*, 47 B.R. 999 (E.D.N.C.1985). Taxes assessed post-petition are therefore obligations of the estate falling under the express provisions of Section 503(b)(1)(B), which are first priority claims under Section 507(a)(1). *Id.;* 11 U.S.C. §§ 503(b)(1)(B)(ii), 507(a)(1).

## FACTUAL AND PROCEDURAL BACKGROUND

Fairchild Aircraft Corp. filed for chapter 11 relief on February 1, 1990. Shortly thereafter, a chapter 11 trustee was appointed.

The local property taxing jurisdictions (Bexar County, Bexar County Northeast Independent School District, and the City of San Antonio) have assessed (or are in the process of assessing) property taxes against Fairchild based upon the valuation of tangible real and personal property of the debtor by the Bexar Appraisal District, as of January 1, 1990. The valuations were actually made post-petition, however.

The parties contest some but not all of the valuations of the Bexar Appraisal District. They agree, for example, that the value of the leasehold improvements is

$4,250,000. They also have stipulated that the taxable value of the aircraft inventory (originally valued by the appraisal district at $16,423,000) is $8,119,810.

The parties are far apart on the valuation of the company's parts inventory, machinery and equipment, and furniture and fixtures. The appraisal district valued the inventory at $36 million, contributing to a total taxable base value of $47,223,000. This value is supported, contend the taxing authorities, by the debtor's schedules (which show a total asset value of nearly $82 million, and inventory, at book value, of over $53 million).[4] Even amended schedules filed in September 1990 reflect a total asset value of $57 million.

The chapter 11 trustee counters that the entire company sold under its plan for about $48 million, an acquisition that included much more than just inventory, machinery, equipment, furniture and fixtures. This sale, says the trustee, is a good indicator of the real value of the assets in question, because it was an arm's length transaction (even though it occurred some nine months after the effective valuation date for tax purposes). After backing out the value of other assets included in the sales transaction (including such items as accounts receivable, cash accounts, executory contracts, consignment inventory not part of the taxable base, the tax refund, security deposits, patents and trademarks, and type and production certificates), the trustee concludes that the taxable property is only worth $24,500,000. The trustee adds that the schedules reflect book values, not market values, and in any event are suspect because they were originally prepared by interim management personnel who did not have access to accurate information about the company's assets. Finally, the trustee points out that the appraisal district's 1990 valuation is significantly at variance from its 1989 valuation, and even

from its original 1990 valuation, which set the taxable base at just $26.5 million. The valuation was re-adjusted upward in August 1990, *after* the trustee filed this motion for determination.

## THE EVIDENCE PRESENTED

At the hearing, the chapter 11 trustee presented evidence from the estate's investment banker about how the company was marketed and what buyers were in fact buying. Over 230 purchasers were solicited from around the country (and the world). Five submitted actual bids. The ultimate purchaser paid $5 million in cash to the estate, agreed to share an anticipated $2.6 million tax refund with the estate, assumed $1.6 million in administrative expenses, and assumed an outstanding debt to Sanwa Business Credit Corporation in the neighborhood of $43 million. There were no cash buyers interested in taking (or able to take) out the existing secured debt to Sanwa. Quite the contrary, buyers of the company were also purchasing the financing already in place, at an interest rate far more favorable than otherwise would have been available on the open market.[5] Because of the manner in which the company was marketed and the nature of the enterprise itself, the fact of bankruptcy did not appear to significantly affect the value of the assets.

The trustee then put on evidence from a financial consultant who had analyzed the sale and had attempted to back out from the total sales consideration those numbers attributable to assets not included in the taxable base used by the appraisal district. By this analysis, the trustee hoped to start with the actual sales price (alleged to be the best indicator of fair value) and by redaction derive the fair value of the assets forming the taxable base. The consultant's valuation methods were rough and

---

4. These schedules were neither prepared nor adopted by the trustee.

5. Actual financing assumed by Fairchild Acquisitions included a $5.4 million revolver at prime, escalating by half a point per year for three years to one and a half points over prime, two term loans (one for $20 million and the other for $15 million) carrying an 11% interest rate and payment terms, and a $3.3 million letter of credit facility with interest terms similar to those of the revolver. The investment banker testified that comparable financing in the marketplace would bear rates of from prime plus two points to prime plus four points.

varied significantly from standard valuation techniques,[6] but the effort did yield at least some enlightening information. For example, the acquiring entity, for its purchase price, picked up cash accounts of $533,922 and accounts receivable worth at least $7,487,571,[7] this latter number including a receivable due from the United States on a government contract (which this court justifiably assumes to be collectible). The purchaser also picked up a $1.3 million share of an anticipated tax return, valued by the consultant at $1 million to account for risk and delay. The purchaser in addition acquired Merlin Express, a wholly-owned subsidiary with a track record documented by its balance sheet. These numbers can essentially be counted dollar for dollar against the purchase price.

On the other hand, the consultant improperly derived values for other assets encumbered by the Sanwa loans assumed by the purchaser. One cannot logically work back from the indebtedness due through the borrowing base percentages to the probable value of the assets against which Sanwa lent because more went into the extension of credit on an ongoing basis than simply the value of the assets. How much was owed to Sanwa as of confirmation may only reflect the amount of money Sanwa felt it appropriate or necessary to lend to the debtor to keep the company up and running, notwithstanding the value of the underlying collateral. It is just as plausible on the other hand that Sanwa had been carefully *reducing* its exposure relative to collateral values. No testimony was adduced on this point. Working back from indebtedness through borrowing base to value is thus suspect for our purposes.

Even if one could use outstanding indebtedness as a starting point from which to estimate collateral values, the process would be further frustrated by the fact that all of the financing vehicles (the revolving loan, the two term loans, and the letters of credit) are cross-collateralized. To know how much of the debt is attributable to any one category of collateral, one would have to already know the value of collateral (to compute a ratio). Of course, it is that very value which we are trying to derive, and the rules of logic prohibit presuming a conclusion in order to reach it. Beyond backing out cash values, applying what amounts to a factor's approach to valuing the receivables, and accepting the valuation of Merlin Express stock, the court must greet the financial consultant's approach with some healthy skepticism.

Another witness for the trustee attempted to give some credence to the financial consultant's valuation of type certificates and production certificates owned by Fairchild (she concluded they made up $3,757,063 of the total acquisition value). These certificates are issued by the Federal Aviation Administration. They permit the manufacture of a given type of airplane (type certificate) or the utilization of a particular plant and its production process (production certificate). To obtain these certificates, a company must make a considerable investment of manhours in research, engineering, testing, and the like in order to come up with specifications acceptable to the FAA. The witness testified that type certificates for the aircraft now being produced cost tens of millions of dollars to develop. He added that production certificates (unlike type certificates) are by themselves non-transferable (i.e., to

**6.** By way of example only, the consultant attempted to attach a value to inventory and accounts receivable derived from the borrowing base utilized in the Sanwa loan documents. Such an approach no doubt yields some information as to value, as Sanwa may be presumed to have factored in what it believes it could recover from the pledged assets in question in the event of a default on the revolving loan (for which the borrowing base is used). It does *not*, however, tell a factfinder what a willing buyer might pay for the assets, which is precisely the inquiry that appraisers make. As it is, the ap-

praisal district's expert did no better, using book values to establish fair value. Book value reflects acquisition cost less depreciation, a perfectly respectable *accounting* technique of somewhat less value to *appraisal* technique. *See Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.),* 93 B.R. 925, 927 (Bankr.W. D.Tex.1988), and cases cited therein.

**7.** The method of valuation employed was similar to what a factor might use—a fair approach to the valuation of receivables.

buy the certificate, you must buy the plant).

No doubt these certificates contributed to the overall value of the company. At the least, any acquiring entity would factor into its overall analysis the benefits of having such certificates in place versus the cost of having to reapply for them (or worse, to start from scratch). Their value, however, is largely dependent on the value of the aircraft being produced under them. In a real sense, the certificates do not so much *add* value by their presence as they would *subtract* value by their absence.[8] They do not really possess a great deal of independent value. Even the type certificates (which are transferable) have little independent value, as they are only as good as the ability to manufacture the plane in question, an ability often tied to the production facility and its approved methodologies, the certificate for which is *not* transferable. The valuation testimony with regard to these certificates must therefore by largely discounted, for lack of any real way to value them apart from the company as a whole. *See* TEX.PROP.TAX CODE, § 1.04(6) (Vernon 1982) (intangible personal property includes licenses and permits).

The taxing authorities' witness was an appraiser for the appraisal district. While ostensibly the right kind of expert, his testimony offered little assistance to the court. By his testimony, he relied on financial information furnished by the company whose assets were being valued—the depreciation schedules, book values, the company's cost analyses, balance sheets and other data from the company's most recent financial statements. What was particularly troubling about his testimony was the paucity of the information upon which he relied and his failure to follow up and test assumptions. For example, he used $36 million for his inventory value, but admitted the number came from the debtor's schedules and had not been tested. He had not seen the inventory since 1988 and had not factored in the company's actual oper-

ating history from December 1989 and January 1990 (when pervasive management turmoil brought production to a near halt and a third of the company's production employees were laid off). *See* TEX. PROP.TAX CODE, § 23.01(a) (Vernon 1982); *Lufkin Land & Lumber Co. v. Noble,* 127 S.W. 1093, 1098 (Tex.Civ.App.— 1910, error refused) (property must be appraised based on the *individual characteristics* that affect the property's market value).

The numbers he derived from the bankruptcy schedules were internally inconsistent as well. The schedules listed "inventory" at "book value," but then directed attention to an attached exhibit. The exhibit included production aircraft inventory, a category which appears to include aircraft inventory valued in the schedules at $28.9 million as of 12/31/89 (the day before valuation). Subtracting this category alone from the scheduled totals, would reduce the book value of the remaining inventory to $24.2 million. The appraiser did indeed subtract the aircraft inventory from the $53 million figure, but not at the comparable book value reflected in the schedules ($28.9 million). Instead, he used the valuation for the aircraft inventory upon which the parties had *settled* just before this trial —$8,119,810. In the process, he subtracted apples from oranges to derive a net number at least *$20 million too high.* This would appear to violate generally accepted accounting principles as well as generally accepted appraisal techniques.

The appraiser also used the January 31, 1990 ending inventory as his starting number ($53.35 million), instead of the statutorily mandated number closest to January 1, 1990, which was $52.4 million as of 12/31/89, a difference of another $900,000. In addition, the appraiser allowed only $2 million for obsolete inventory, even though the schedules showed $2.3 million. He had not personally inspected the inventory since 1988, so had no basis for making this

---

**8.** The court takes judicial notice that similar certificates held by Fairchild were sold to the purchaser of Fairchild's subsidiary, Crestview Aerospace, for less than $10,000, evidence adduced at the confirmation hearing in the Crestview Aerospace case (a hearing which was held the same day).

adjustment. This results in yet another adjustment to the appraiser's number, this one of $300,000. These adjustments alone would reduce even the appraisal district's estimate of inventory value derived from the bankruptcy schedules to $14 million, just $2.5 million higher than the trustee's value.

The appraiser's reliance on book values as a starting point for valuing inventory is, in the view of this court, suspect,[9] but his basis for further adjusting that valuation lacks any foundational support whatsoever. He testified that even the $26.5 million valuation originally assigned to the estate's personalty was a number he adjusted for "operating performance factors" about which he learned from *newspaper articles* relating to how the company was doing in March 1990. There was no evidence presented that newspaper articles are a source of information that appraisers generally rely on. He did not even try to verify these newspaper reports, nor did it apparently bother him that he had used a factual factor taking place *after* the official valuation date of January 1, 1990. This $26.5 million valuation was only adjusted upward to *$47 million* in August 1990, *after* the trustee filed this motion for determination pursuant to Section 505.

Significantly absent from the approach used by the appraiser are the standard appraisal techniques mandated by Texas law. *See* TEX.PROP.TAX CODE, § 23.01(b) (Vernon Supp.1990) and discussion *supra*. The appraiser essentially restricted himself to the cost approach to value. There has been no analysis of comparable markets for the inventory, equipment, furniture and fixtures, nor was there any effort to tie the numbers used to how a willing buyer might arrive at a going concern value for those assets.

 Taken together, this line of testimony, filled as it is with inconsistencies and irregularities, tends to support the trustee's contention that the valuation upon which the 1990 personal property taxes are premised are "grossly excessive," within the meaning of Texas case law. The appraisal district originally valued the inventory, furniture and fixtures, machinery and equipment, and leasehold improvements in April of 1990 at a total of $26.5 million, but revised the number upward substantially to $39 million in apparent response to this pleading, based on the bankruptcy schedules and little else. In so doing, the appraisal district transgressed Texas' case law proscriptions against arbitrary valuations having little or no relation to "fair cash market value." *See Pierce v. City of Jacksonville*, 403 S.W.2d at 517; *Westwood Ind. School Dist. v. Southern Clay Products, Inc.*, 604 S.W.2d at 515. The court concludes that the valuation urged by the appraisal district results in a grossly excessive valuation, that the appraisal methods used were not in conformity with generally accepted appraisal techniques, and that, therefore, such valuations must be rejected. The court is then left to re-value the property based upon the evidence before it. TEX.PROP.TAX CODE, §§ 42.24, 42.25 (Vernon 1982); *see* 11 U.S.C. § 505(c) (permitting assessment by the taxing authorities once the bankruptcy court has determined the tax).

## VALUATION DETERMINATIONS

Although the state of the evidentiary record is far short of what this court would expect to have in hand to establish a market value of such magnitude, it is at least sufficient to permit the court to arrive at a valuation that fits within the generous standards afforded appraisal districts by Texas law. *See Corrigan Properties, Inc. v. City of West University Place*, 430 S.W.2d at 921; *Houston Shoe Hospital v. State*, 423 S.W.2d at 626 (reasonable discrepancies between true values and assessed values will be tolerated). So long as that determination is not clearly erroneous, it will offend neither Texas law nor principles of federal appellate review. TEX.

---

**9.** The court acknowledges that the fault may very well lie at the inadequacy of appraisal technique itself to furnish a going concern valuation for such assets. As buyers do not normally value such assets independently on a going concern basis, the appraisers' task of predicting the behavior of buyers is inherently speculative.

PROP.TAX CODE, § 42.28; Bankr.R. 8013. We turn then to the valuation of the personal property at issue.

Furniture and fixtures were valued by the appraisal district at 1989 depreciated cost less 10%, or $458,800. Machinery and equipment were valued in a similar manner, yielding a value of $1,786,470. Computer equipment was added in, again at depreciated cost, for a total of $526,640. Finally, vehicles were valued using the appraisal district's schedule, yielding a value of $2,400. The total value assigned to this category of property by the appraisal district was $2,774,310.

The trustee gave no separate value to vehicles, but assigned an overall value of $1,454,590 to furniture, fixtures, machinery and equipment. Her valuation for these items was derived from 1989 fixed asset ledgers at the date closest to January 1, 1990. For fully depreciated items, she added back in 20% of cost as a residual value (18% for the fully depreciated and somewhat antiquated computer equipment), in accordance with appraisal district standards.

The court finds that the approach taken by the trustee is more likely to yield a value approximating market value of furniture and fixtures, machinery and equipment, in place as a going concern. Few buyers would purchase such assets at their full depreciated book value. They would instead focus on income producing capacity. The appraiser, however, did not analyze income production capacity, focusing instead on depreciated cost as his sole indicator. For an income approach to valuation to be valid, the property must be producing income or its potential for producing actual income must be definite and predictable. The income approach is not applicable in instances where the property produces no income or produces a net operating loss. *Missouri K.T.R. Co. v. Dallas,* 594 S.W.2d 766, 771 (Tex.Civ.App.—Dallas 1979), *rev'd on other grounds,* 623 S.W.2d 296 (1981).

The purchase price offered by the trustee at least offers a glimpse at buyers' evaluations about income production capacity. The court finds it reasonable to infer that a entity would not pay over $47,000,000. for an asset that did not have some sort of income production capacity. Even though it post-dates the January 1, 1990 valuation date, what the company fetched in late 1990, in the kind of sale ultimately achieved, seems to this court to be little different from the price which might have been realized had the same sale been obtained in late 1989 following the same sale procedure.[10] In support of this contention, the credible evidence indicates that the sale of a business such as Fairchild might take quite a few months. It was not the type of sale that could take place overnight. That is one of this property's individual characteristics which should be taken into account in its valuation. *Lufkin Land,* 127 S.W. at 1098. Normally transactions that take place after January 1, 1990 should have no effect on the property value for taxing purposes. *Kirby,* 33 S.W.2d at 474. In this instance, however, the sale of Fairchild can be reasonably seen to have taken place within the time period which would properly have been factored into the original valuation of Fairchild. Accordingly, it seems to be appropriate to consider the ultimate sale price of Fairchild to the Carl Albert group as *one* of the indicators of value.

Furthermore, the trustee was operating with more accurate data. Unlike the appraiser, who had not visited the plant since 1988, the trustee was not only on-site but was also accountable to the court and the estate for an accurate rendition of the estate's assets. Her raw numbers were (and are) more credible than those used by the appraisal district. Her valuation appears to be more in line with generally accepted appraisal techniques.

The court concludes that the taxable value of the estate's furniture and fixtures, machinery, and equipment as of

---

**10.** In fact, the ultimate buyer, the Carl Albert group, had pursued a possible acquisition in that time frame. Albert himself even served as CEO for a very short time in anticipation of a sale.

January 1, 1990 was as valued by the trustee, $1,454,590.[11]

The inventory valuation represents the largest value differential, with the appraisal district concluding that the inventory was worth over $36 million as of January 1, 1990, and the trustee countering that the inventory was worth no more than $11,500,000. We have earlier noted the flaws in the appraisal district's methodology. It began with inherently suspect bankruptcy schedules, and ignored its own valuations from previous years[12] as well as the rendition by Fairchild itself just prior to bankruptcy.[13] In the spring or summer of 1990, the appraisal district was prepared to live with a total assessed taxable base of $26.5 million for not only inventory but also furniture, fixtures, machinery, equipment, the computer, and vehicles. If we back out the $2.774 million number that represents property other than inventory, all that would be left would be the inventory, or approximately $23.8 million. Even though this number is itself flawed (due to the appraiser's "adjustment" based on his reading of newspaper articles referenced earlier), it is nonetheless fully 30% *less* than the $36.2 million number which the taxing authorities now proffer. Neither number bears any realistic relationship to either the renditions of the debtor ($7.8 million) or the adjusted book value derived earlier in this decision ($14 million).

The trustee's approach, which attempted to derive going concern value attributable to inventory from the total consideration paid by Fairchild Acquisitions, also does not conform to standard appraisal methodology. However, due to the circumstances of this particular case, the trustee's approach yields some relevant data. We note first of all that this sale was conducted in a manner calculated to yield a value as close to market as possible, using the services of an investment banker familiar with the industry. We next note that virtually all the offers ultimately made ended up in the same general range and structure (cash in the neighborhood of $4 million to $6 million, plus assumption of existing debt). We note finally that all purchasers were buying financing perhaps as much as they were buying assets, suggesting that the total purchase price paid may overstate the actual value of the assets apart from the financing. These factors borne in mind, coupled with a "back out" of easily valued cash items and an estimate of value attributable to financing, suggest that the trustee's net estimate of inventory value may actually be *generous*.[14] Indeed, given prior years' valuations by the appraisal district, the true value of the inventory may have been somewhat (or even considerably) less than the estimate given by the trustee's consultant.[15] The court therefore adopts the

11. The trustee's numbers also justifiably took into account the extent to which a willing buyer such as Fairchild Acquisitions would factor in the going concern value of such assets in deciding whether to assume existing financing. To the extent the debt load on the company far exceeds the going concern value of the assets in place, one may reasonably conclude that a willing buyer would be unwilling to assume the financing unless the financing package itself is intrinsically attractive. The evidence before the court indeed reflects that buyers were in fact purchasing the in-place financing as much as they were purchasing assets, an observation that only tends to *depress* the value which the court might otherwise attribute to these assets (because a portion of the purchase price should be allocated to the purchase of in-place financing).

12. In 1989, the appraisal district valued machinery, equipment, furniture, fixtures and inventory together at about $11 million.

13. FAC rendered the inventory at $7,845,500.

14. The court rejects the taxing authorities' unsupported "argumentum ad hominem" that the fact of bankruptcy itself necessarily deflated the value to be realized for the company's assets, casting doubt on the veracity of the sales price as an indicator of fair value. The argument violates the Texas Property Tax Code's definition of market value, which directs appraisers to *ignore* a buyer's ability to take advantage of exigencies of the seller, such as bankruptcy. TEX.PROP.TAX CODE, § 1.04(7)(C) (Vernon 1982). The realities of chapter 11 bankruptcy reorganizations in the late 20th century also belie these contentions.

15. The court is most reluctant to take depreciated book value of inventory to be the same as its fair market value, though it may be an indicator. When someone proposes to buy a company, certainly they examine the company's financial statement, which reports this number. They do not, however, purchase the inventory *qua* inventory so much as they purchase a going

debtor's valuation, $11,500,000, because it is both supportable and most favorable to the taxing authorities.

## CONCLUSIONS

The total taxable value of the debtor's taxable property is thus as follows:

| | |
|---|---|
| Inventory | $11,500,000.00 |
| Furniture, fixtures, machinery & equipment | $ 1,454,590.00 |
| Leasehold improvements | $ 4,250,000.00 |
| Aircraft | $ 8,119,810.00 |
| TOTAL | $25,324,400.00 |

Applying the stipulated applicable tax rates (Respondent's Exhibit 3) to the foregoing valuation yields 1990 property taxes in the following amounts for the following taxing authorities:

| | |
|---|---|
| Bexar County | |
| Road & Flood | $ 6,118.38 |
| Edwards Water | 2,456.47 |
| Community College | 22,260.15 |
| Hospital District | 57,410.41 |
| Bexar County | 74,476.53 |
| SUBTOTAL | $162,721.94 |
| Northeast ISD | $275,582.65 |
| City of San Antonio [16] | $133,801.47 |
| TOTAL PROPERTY TAXES | $409,384.12 |

The appraisal district is directed to assess the estate's personal property using these values, pursuant to Section 505(c). The taxing authorities are allowed administrative claims in the foregoing amounts pursuant to Section 503(b)(1)(B).

So ORDERED.

concern capable of generating income, to which the presence of inventory on site contributes. Some examination of markets and contribution to income generating capability would seem to be part and parcel of the valuation process, though no evidence of such an analysis was presented in this case. It may be that appraisal techniques adequate to value inventory in place have yet to be developed.

16. The court assumes that City of San Antonio taxes accrue on the same property as do Bexar County and Northeast ISD taxes, although Movant's Exhibit P–4 (which includes a tax bill for the City of San Antonio) suggests that only leasehold improvements are the subject of the city's tax. If true, the court invites a motion to modify the order to make it properly conform to state law in that regard.