**In re QUALITY BEVERAGE CO., INC., Debtor.**

**Bankruptcy No. 93–48124–H3–11.**

United States Bankruptcy Court, S.D. Texas, Houston Division.

July 22, 1994.

Lenard M. Parkins, Trey A. Monsour, Kyung S. Lee, Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Houston, TX, for debtor.

G. Tood Stewart, Olson & Olson, Houston, TX, for Harris County Appraisal Dist. and Appraisal Review Bd.

## MEMORANDUM OPINION

LETITIA Z. CLARK, Bankruptcy Judge.

The Court has heard the motion of Quality Beverage Company, Inc., Debtor, for Determination of Personal Property Tax Liability. To the extent any findings of fact herein are construed to be conclusions of law, they are hereby adopted as such. To the extent any conclusions of law herein are construed to be

findings of fact, they are hereby adopted as such.

### Jurisdiction

This Court has jurisdiction to hear and determine this Motion pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(b)(2), 11 U.S.C. § 505(a)(1) and the Standing Order of Reference of the United States Bankruptcy Court for the Southern District of Texas, dated August 9, 1984.

### Background

Debtor was one of the largest wholesaler-distributors of liquor in Texas. The Debtor was in the business of buying on a wholesale basis from suppliers and distributing to retailers distilled spirits, wine, beer and other beverages throughout Texas. The Debtor distributed major labels, some on an exclusive basis, and some on a non-exclusive basis.

The Debtor conducted the majority of its operations in four counties in Texas: Bexar, Harris, Tarrant and Dallas. The Debtor was headquartered in Harris County on real property it owned there. The Debtor's principle asset in all counties consisted primarily of inventory. The Debtor also owned certain equipment necessary for the conduct of its business, including furniture, fixtures, machinery, and equipment (the "equipment").

On October 28, 1993, the Debtor filed its Voluntary Petition under Chapter 11 of the United States Bankruptcy Code ("the Code"). The Debtor is managing its properties as debtor-in-possession pursuant to Sections 1107 and 1108 of the Code. At a hearing on November 12, 1993, the Debtor announced that it would cease operations and would begin liquidating its assets in the Chapter 11 case.

Based on its own review, the Debtor determined that taxing authorities in several counties may have had several types of tax claims against it, including real property and alcoholic beverage tax claims, but the only tax claims challenged by this motion were personal property ad valorem secured tax claims for calendar year 1993 (the "Personal Property Taxes"). With the filing of its motion, the Debtor sought a determination of its proper tax liability for Personal Property Taxes claimed by Independent School Districts (ISD) in Arlington, San Antonio, and Houston; the counties of Bexar, Ector, Harris, and Tarrant; and the cities of Grand Prairie, Houston, and San Antonio. Prior to the hearing on this motion objections were dropped by all but Harris County, Houston ISD, and the City of Houston (the "Taxing Authorities"). Evidence at the hearing was presented only as to the claims of these Taxing Authorities.

The Taxing Authorities' Personal Property Tax claims totaled approximately $743,145.00, based on personal property appraised at an adjusted value of approximately $26,722,400.00. The Debtor sought to have this Court adjust the appraised value of its personal property and redetermine its tax liability, requesting a downward adjustment of over 40 percent.

### Determination of Personal Property Taxes

Under § 505(a)(1) of the Code the Court is authorized, subject to certain limitations, to determine the amount or legality of any tax, fine or penalty relating to a tax, or any addition to a tax. Thus, a forum is available to determine the legality or amount of tax claims in a manner intended to minimize delay in administration of the estate.

Limitations established by § 505(a)(2) preclude the court from determining the amount or legality of such liabilities if those issues were contested before and adjudicated by the appropriate tribunal prepetition.

■ The burden of proof of showing that assessments made by the state auditor were unreasonable is on the Trustee; also, the burden of showing that the taxes are in derogation of Trustee's rights is on the Trustee. *In re Lang Body Co.*, 92 F.2d 338 (6th Cir.1937), *cert. denied* 303 U.S. 637, 58 S.Ct. 522, 82 L.Ed. 1097. Here, the burden of proof is on the debtor-in-possession to show that the appraisal of its personal property was unreasonable.

■ Property taxation is a two-part process: valuation of property and application of the appropriate tax rate. The use of § 505 to remove valuation adjudication to the bank-

ruptcy court is consistent with the intended function of § 505 and does not undermine the state property taxation process. *In re Fairchild Aircraft Corp.*, 124 B.R. 488 (Bankr. W.D.Tex.1991).

■ When a bankruptcy court values property for purposes of determining a debtor's tax burden, its valuation must be consistent with state law. *In re Fairchild*, 124 B.R. at 492. The Bankruptcy Court must give full faith and credit to the state law upon which the tax to be determined is based. *Arkansas Corp. Commission v. Thompson*, 313 U.S. 132, 142, 61 S.Ct. 888, 891, 85 L.Ed. 1244 (1941). The substantive law that will govern the Court's determination of the debtor's taxes due is the law of the State of Texas, as set out in the Texas Tax Code.

Texas law requires generally that "all taxable property is appraised at its market value as of January 1." Additionally, "[t]he market value of property shall be determined by the application of generally accepted appraisal techniques.... However, each property shall be appraised based upon the individual characteristics that affect the property's market value." TEX.TAX CODE ANN. § 23.01 (Vernon 1992). Market value is defined as

... the price at which a property would transfer for cash or its equivalent under prevailing market conditions if:

(A) exposed for sale in the open market with a reasonable time for the seller to find a purchaser;

(B) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and

(C) both the seller and the purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other.

TEX.TAX CODE ANN. § 1.04(7) (Vernon 1992). This definition, as the general rule, would be used to establish the appraised value of the Debtor's equipment for Personal Property Tax liability.

The market value of an inventory is given slightly different treatment under § 23.12, which states that "the market value of an inventory is the price for which it would sell as a unit to a purchaser who would continue in the business." TEX.TAX CODE ANN. § 23.12(a) (Vernon Supp.1994).

■ There is sufficient Texas case law on the issue of tax determination as well. A taxpayer who contests an allegedly excessive property valuation must prove that the valuation is grossly excessive; should this burden not be met, cancellation of the assessments should not follow. *Johnson v. Holland*, 17 Tex.Civ.App. 210, 43 S.W. 71 (1897); *Pierce v. City of Jacksonville*, 403 S.W.2d 512 (Tex. Civ.App.—Tyler 1966, writ ref. n.r.e.). Reasonable discrepancies between the true value of property and its assessed value is permissible to cover a difference in opinion or judgment. *Pierce*, 403 S.W.2d at 517; *Corrigan Properties, Inc. v. City of W. University Pl.*, 430 S.W.2d 917, 922 (Tex.Civ.App.—Houston [1st Dist.] 1968, no writ). Variances have been characterized as grossly excessive when the difference between assessed and true value has been from 33 percent to 75 percent. *In re Fairchild*, 124 B.R. at 494, citing *Corrigan*, 430 S.W.2d at 921.

■ An important aspect of Texas jurisprudence in this area is the proposition that property is appraised for tax purposes on January 1 of the tax year. TEX.TAX CODE ANN. § 23.01. At the option of the taxpayer, an inventory may be valued as of September 1 of the year prior to the tax year. TEX.TAX CODE ANN. § 23.12(f). Conditions arising after January 1 (or September 1, as appropriate) of the tax year may not be considered in establishing the market value of the property to be taxed. *Kirby v. Transcontinental Oil Co.*, 33 S.W.2d 472 (Tex.Civ. App.—Waco 1930, writ ref'd). The Debtor and the Taxing Authorities differ as to the interpretation of this rule, and the Debtor would have this Court adopt a novel variation of the rule.

The Taxing Authorities urge that controlling Texas statutory and case law requires that the property's value be determined by a "snap shot" analysis of the market, the prop-

314

erty, and conditions affecting both, at the time of valuation.

The Debtor, on the other hand, proposes a novel interpretation of *Kirby* and *City of Arlington v. Cannon*, 263 S.W.2d 299 (Tex. Civ.App.—Ft. Worth 1953), *aff'd in part and rev'd in part (on other grounds)*, 271 S.W.2d 414 (Tex.1954). The Debtor acknowledges that both cases are generally cited for the proposition that prospective factors may not be used to determine the market value for tax purposes, but advances the theory that only *taxing authorities* are not permitted to consider such factors, because "unfairness" would result to the taxpayer. The Debtor's analysis of these cases leads it to the conclusion that prospective factors should not be considered only when a taxpayer may suffer inflated consequences, and not when it is the taxing authority that may suffer a shortfall in projected tax collection.

Assuming *arguendo* that the "unfairness" issue should not be seen by the Court to cut both ways, the Court is still not free to accept the Debtor's novel argument, for Texas courts have already considered and rejected it. *State v. Republic Natural Gas Co.*, 181 S.W.2d 592 (Tex.Civ.App.—San Antonio 1943, writ ref'd) has declared as well settled law the proposition that property shall be assessed at its market value as of January 1. In *Republic Natural Gas* the taxpayer claimed that its property, assessed on January 1 when oil was still being produced, should be devalued for tax purposes based on the contention that oil production had ceased in March. The court disagreed, stating that the "fact that the well upon the leasehold here involved ceased to produce in March can at most be considered as some evidence of the physical condition of the well on January 1, 1935." *Republic Natural Gas*, 181 S.W.2d at 594. Texas law, as thus described, forecloses the Debtor's argument.

The rule is not absolute, and this Court has considered the reasoning in *Fairchild*, *supra*, in which the court found that the "individual characteristics" referred to in the Texas Tax Code § 23.01 could include an extended time period required to sell a business concern, and that the sale price could be used as one factor in determining the actual

market value when the property was appraised for tax purposes. In *Fairchild*, the tax year in question was 1990. The Bankruptcy case was filed in February, 1990, and sale of the going concern authorized in "late 1990." The facts in *Fairchild* are distinguishable from the facts of the instant case.

*Evidence Presented to the Court*

John W. Hunt, chief executive officer of Quality Beverage Company, Inc. (Debtor), testified credibly as to the following matters. He has been with the company since June 1991, and is familiar with the financial position of the company. He first noticed external economic factors which negatively affected the company's business, ultimately resulting in bankruptcy, within two weeks after his joining the company. Hunt testified credibly that the following factors produced or contributed to producing the following effects:

1. Prior to his arrival, the company had agreed to a $17 million stock buyout of a 50 percent partner, Michael Saragusa. This created a negative financial equity in the company and caused discomfort among suppliers.

2. Two major suppliers terminated long-lasting relationships with the company, resulting in a $7.5 million reduction in gross profits in the next year.

3. Remaining suppliers converted their financial arrangements with the company from credit to cash-on-delivery (COD). The first major change came in January 1993, with others following. The immediate result was to require the company to pay off its previous credit balance in order to clear the way for future (COD) deliveries. The company's first credit balance to be paid was about $2.5 million. When other suppliers required the same arrangements, the company suffered a severe cash shortage that eventually led to bankruptcy.

4. The company continued to suffer additional costs associated with managing its inventory and financial problems. All of the above factors had a negative impact on the company.

Hunt testified that he helped prepare, and he signed, the Form 22.15, Business Personal

Property Rendition of Taxable Property (the Property Form), which estimated the market value of the company's taxable personal property. He submitted the form to the Harris County Appraisal District (HCAD). When Hunt prepared this self-appraisal he valued both the inventory (which consisted primarily of alcoholic beverages) and the equipment (which consisted of furniture, fixtures, machinery and equipment). For the inventory, he used the landed cost of the products and subtracted deductions for Federal Excise Taxes, Foreign Trade Zone Exclusion, and functional obsolescence caused by deterioration of products. He did not deduct any values for external economic factors. For the equipment, he depreciated the original cost based on the average age, and reported this depreciated figure. The methods he used initially were those he believed were required by the HCAD. At the hearing Hunt proposed using a different valuation method for the equipment, one based on market value.

On cross-examination, Hunt testified that he believed the external economic factors were applicable to the value of all the company's property, because the property was part of the same financial entity.

Walker Knight, a C.P.A., testified on behalf of the Debtor as an expert in the area of tax valuation of personal property. In his opinion, the statewide 1993 assessments on the Debtor's personal property were overvalued by over 43 percent.

Knight was retained in 1994 by the Debtor to assist in the proper valuation of personal property for the tax year 1993 (after valuation had previously been submitted by the company based on the figures determined by Hunt). Knight determined that the Debtor had failed to account for various external economic factors that could be used to depreciate the value of the inventory and equipment. Knight used a cost approach to valuation of the inventory, and changed from a cost approach to a market value approach in the valuation of the equipment.

Knight would devalue the inventory based on the following factors not previously considered by the company:

1. Five percent reduction for shrinkage, spoilage and unsalable inventory. Knight determined that based on prior experience, this was a conservative figure (despite the fact that schedules submitted by the Debtor to HCAD and introduced as evidence indicate that an *actual* figure for inventory that was unsalable or of reduced value was only approximately 3.3 percent).

2. Approximately 18.5 percent reduction for economic obsolescence due to loss of gross profit margin. Knight testified that the *inventory* (which consisted primarily of distilled spirits) suffered as a result of business conditions. The figure was derived from analyzing gross operating profit from the four previous years.

3. $5.25 million reduction (approximately 12.5 percent) for the post-petition cost of maintaining for liquidation and then for liquidating the inventory.

4. Knight also testified that the cost of capital, which he valued at $2.9 million, or approximately 7 percent, was an appropriate deduction because the sale of an inventory, as a unit, would take a long time.

Knight would adopt a different approach to the other property (the equipment) than that used when the company's rendition was completed in 1993. He valued the equipment at $610,250.00 based on a March, 1994 Bill of Sale for cash actually received from sale of the equipment through an auctioneer. The sale was not a "fire sale", but rather involved a two month showing of the equipment, during which time bidders made sealed bids for the property.

Finally, Knight testified that he considered using a market approach for the valuation of the inventory, but selected the cost approach minus deductions because certain segments of the inventory had no market (which segments were not identified) or there was no data to support a market analysis.

On cross-examination, Knight testified that he used a broad, general approach to the problem as compared to looking at specific products (for example: what market for 630 cases of Johnnie Walker Red Scotch whiskey). Additionally, Knight testified that his figures for Harris County/Houston were based on 61.5 percent of the total, as that

represented the portion of inventory in Harris County as a proportion of the whole inventory.

Mr. Donald Landrey testified credibly on behalf of the Taxing Authority as an expert. As an HCAD employee, Landrey had reviewed the files and the appraisal, which was based on the rendition of property submitted by the Debtor. (The HCAD official who had prepared the file and appraised the property in 1993 has since died). Landrey testified that the Debtor's original valuation, based on the rendition submitted by the Debtor, was $22,709,743.00 for personal property. HCAD allowed all the Debtor's deductions for Foreign Trade Zone exclusion, and most of the allowance for damaged goods, and disallowed only the deduction for Federal Excise Tax and 20 percent of the last deduction for unsaleable goods (20% of $275,954 disallowed). The Federal Excise tax was not allowed because it is part of the price of alcoholic beverages; this testimony was not disputed by the Debtor. Landrey's expert opinion was that the market value approach would yield the correct market value for property taxation purposes.

On cross-examination, Landrey testified that he had not performed an independent valuation using any approach (market, cost or income), and that he had not personally been involved in the appraisal of the property in 1993. He stated that he would use the booked-in cost method of valuation because the inventory was of a type that would turn over at a sufficient rate that cost in place would approximate replacement cost.

Landrey testified that the rendition by the Debtor, including the 137 page computer run that broke down the entire inventory by item, was the best documented file he had seen in some time, and that the information submitted in the file (and introduced into evidence), showing every item on hand and its booked-in price, was some indication of market value of the inventory.

### Determination of Property Valuations

■ The Court finds that the evidence presented to it by testimony and exhibits is "sufficient to permit the court to arrive at a valuation that fits within the generous stan-dards afforded appraisal districts by Texas law." *In re Fairchild,* 124 B.R. at 498. As an initial matter, the Court will evaluate the state of affairs of the Debtor company as they existed in late 1992.

The Court finds that the Debtor company did experience serious business difficulties beginning in mid–1992, that were present at the time of the valuation of both the inventory and the equipment. However, a business concern has a value of its own, embodied in its good will, its credit worthiness, and its success as a "going concern." The inventory, consisting primarily of distilled spirits, wine, and other alcoholic and non-alcoholic beverages, had a separate ascertainable value, and this value was virtually the same whether the inventory was held by the Debtor, or another beverage distributor (the potential purchaser who would continue in the business).

■ As to the general issue of functional obsolescence due to damage, spoilage and shrinkage, the Court finds that the appropriate figures to use to determine the amount of this deduction are those reported by the Debtor on its Property Form in its original rendition. These amounts were developed from actual lists of damaged inventory, rather than from an average 5 percent breakage figure. The 20 percent of one of the deductions for Unsaleable Items that was disallowed by HCAD was not supported in testimony and is inconsistent with the full allowance of the first amount for Unsalable Items. The full amount claimed, $275,954.00 is allowed. This is in addition to the $585,206.00 and $192,561.00, allowed by HCAD as deductions for damaged inventory.

■ The Court finds that the Debtor improperly deducted Federal Excise Taxes, and the deduction in the amount of $3,792,404.00 is not allowed.

As to the external economic factors, HCAD had argued that these factors were prospective and thus not applicable to the determination of the "snap shot" inventory valuation. Assuming, *arguendo,* that consideration of these factors is not prospective, the factors still did not negatively impact the market value of the inventory, which is the

valuation of the property on which taxes are determined under Texas law.

■ The loss of gross profit due to the loss of two key suppliers simply would not significantly reduce the market value of the remaining items of inventory. Liquor has its price, and in a major metropolitan market such as Houston/Harris County, willing buyers can be found. The loss of the suppliers would likely have a negative impact on the company as a whole, and unfortunately, it did. But the value of the inventory is best set by the 1992 price list submitted as an exhibit in these proceedings.

■ The cost of liquidation and the cost of capital to finance the preservation of inventory are not here allowed as factors which would legitimately have affected the valuation of the inventory on September 1, 1992. The Court declines to find that the costs the company would come to incur some 15 to 20 months later had any impact on the value of the stock on hand in September 1992.

■ As to the equipment, the Debtor has argued that the March 1994 sale of the equipment for only $610,250.00 should be used as a factor to determine that its January 1, 1993 value was not $783,280.00 but was really closer to the lower figure. In *Fairchild*, the "equipment" for sale was an entire aircraft manufacturing corporation, including production facilities, Federal Aviation Administration certificates, inventory, accounts receivable, and a "going concern." The court noted that one of the individual characteristics of an aircraft production company, which under Texas law should be considered in valuing the property, was the length of time it would require to sell such a concern. *In re Fairchild*, 124 B.R. at 499.

Here, the equipment was not offered for sale near the time of the valuation, but 12 months later, with sale 2 months after offering. The sale was not of the "going concern." The original cost, depreciated by the average age of the equipment, as originally reported by the Debtor and accepted by HCAD, is adopted by the Court as establishing the valuation of the equipment for 1993 Personal Property Taxes.

*Conclusions*

The taxable value of the Debtor's personal property in Harris County for tax year 1993 is as follows:

| | |
|---|---:|
| Inventory | 30,307,019 |
| Deductions: | |
| —Foreign Trade Zone | (3,440,042) |
| —Unsaleable | (585,206) |
| —Reduced Mkt Value | (192,561) |
| —Unsaleable | (275,954) |
| Subtotal | 25,813,256 |
| Equipment | 783,280 |
| Total | 26,596,536 |

The Harris County Appraisal District is directed to assess the estate's personal property taxes using these values, pursuant to § 505(c). The taxing authorities are allowed administrative claims pursuant to § 505(b)(1)(B).

So ORDERED.